# In the United States Court of Federal Claims

No. 23-1268
(Filed:  6 February 2024)[*]

```
*****************************************
HEALTH NET FEDERAL SERVICES,          *
LLC,                                   *
                                       *
              Plaintiff,               *
                                       *
v.                                     *
                                       *
THE UNITED STATES,                     *
                                       *
              Defendant,               *
                                       *
and                                    *
                                       *
TRIWEST HEALTHCARE ALLIANCE            *
CORPORATION,                           *
                                       *
              Defendant-Intervenor.    *
                                       *
*****************************************
```

## OPINION AND ORDER

*Amy L. O'Sullivan*, with whom were *Robert J. Sneckenberg, Cherie J. Owen, James G. Peyster, William B. O'Reilly, Zachary H. Schroeder, Issac D. Schabes*, and *David H. Favre III*, Crowell & Moring LLP, all of Washington, DC, for plaintiff.

*William P. Rayel*, Senior Trial Counsel, with whom were *Douglas K. Mickle*, Assistant Director, *Patricia M. McCarthy*, Director, Commercial Litigation Branch, *Brian M. Boynton*, Principal Deputy Assistant Attorney General, Civil Division, Department of Justice, *Michael R. Bibbo, Song U. Kim*, and *Dennis A. Dyke*, Defense Health Agency, Office of General Counsel, all of Washington, DC, for defendant.

*Marcia G. Madsen*, with whom were *Luke Levasseur* and *Evan C. Williams*, Mayer Brown LLP, *Robert S. Ryland* and *H. Boyd Greene*, Kirkland & Ellis LLP, *Kathleen C. Little, Robert J. Rothwell, Robert D. Vander Lugt, Amanda J. Dietrick*, and *Jenny J. Yang*, Little,

---

[*] This opinion was originally filed under seal on 31 January 2024 pursuant to the protective order in this case.  The Court provided the parties an opportunity to review this opinion for any proprietary, confidential, or other protected information and submit proposed redactions by 5 February 2024 at 5:00 p.m. (ET).  The parties proposed redactions by the deadline.  The Court accepts the parties' proposed redactions and reissues the order, with a few minor, non-substantive corrections and redacted language removed on figures and/or replaced as follows: "[XXXXX]."

Rothwell & Vander Lugt PLLC, all of Washington, DC, for defendant-intervenor.

**HOLTE, Judge.**

Plaintiff Health Net Federal Services, LLC ("Health Net") brings this post-award bid protest challenging the Defense Health Agency's (DHA) award of a firm-fixed price contract providing health care services to defendant-intervenor TriWest Healthcare Alliance Corporation ("TriWest"). Health Net alleges the $65,000,000,000 contract award was flawed because DHA overlooked TriWest's material misrepresentations, followed incorrect methodology regarding subcontracting, and did not adhere to the Solicitation's standards.

Health Net filed its first GAO protest in January 2023 alleging TriWest improperly calculated its small business participation. DHA took voluntary corrective action, reevaluating TriWest's small business participation factor, and reopening discussions with TriWest and Health Net. After reviewing TriWest's revised proposal and deeming it acceptable, DHA re-awarded the contract to TriWest in April 2023. Health Net then unsuccessfully filed a second GAO protest challenging the re-award to TriWest. Health Net now protests DHA's decision to award the contract to TriWest after corrective action, alleging TriWest made material misrepresentations and DHA made an erroneous responsibility determination and arbitrarily and capriciously evaluated TriWest's revised proposal.

After filing its Complaint, plaintiff filed a Motion for Discovery and Supplementation of the Administrative Record in support of its material misrepresentation claims. Plaintiff argued the omission of certain documents related to TriWest's subcontractors' corporate structure would prevent effective judicial review of its allegations. The Court denied these Motions in a 29-page order on 29 September 2023. *Health Net Fed. Servs., LLC v. United States*, 168 Fed. Cl. 1 (2023). The Court determined DHA considered the issues raised by plaintiff during corrective action and reviewed the information and documentation it deemed sufficient to make an award decision. The Court therefore found the Administrative Record was sufficiently complete for judicial review and denied plaintiff's Motion to Supplement. After the Court issued the September 2023 Order, plaintiff then filed its Motion for Judgment on the Administrative Record. The government and TriWest filed cross-motions for judgment on the administrative record.

For the following reasons, the Court denies plaintiff Health Net's Motion for Judgment on the Administrative Record, grants the government's Cross-Motion for Judgment on the Administrative Record, and grants TriWest's Cross-Motion for Judgment on the Administrative Record.

## I.  Factual Background

The Court recounted the factual background of this case in its September 2023 Order denying plaintiff's Motions to Supplement the Administrative Record:

### [A.]  History of Solicitation, GAO Protests, and Court of Federal Claims Protest

### [1.] Solicitation and Award

Plaintiff[1] is a Sacramento, California-based managed care support contractor.  Compl. Ex. 1 ("GAO Decision"), at 2, ECF No. 1-2.  On 15 April 2021, the Department of Defense ("DoD"), Defense Health Agency ("DHA")[2] issued a Request for Proposals ("RFP") for a "managed care support contract for . . . the western region of the United States" (the "T-5 RFP").  *Id.* (footnote omitted).  The more than $65 billion contract "involve[s] providing a suite of services for TRICARE beneficiaries analogous to the services provided by a conventional commercial health insurance provider . . . negotiat[ing] discounts with healthcare providers on behalf of [DHA] . . . and integrat[ing] open market healthcare with the military's direct care system."  Compl. ¶ 1, ECF No. 1; GAO Decision at 2.  The managed-care support contractor is responsible for creating "networks of healthcare providers," "process[ing] claims," and providing "customer service" to TRICARE beneficiaries, including "military members and their families."  GAO Decision at 2.  TRICARE supplements the federal government[']s "military hospitals [and] clinics" and enables "military members and their families . . . [to purchase healthcare services] on the open market."  *Id.*

Plaintiff is the "incumbent TRICARE managed care support contractor for the western region" and "has managed health care programs for [DoD] . . . for more than three decades."  GAO Decision at 3; Compl. ¶ 13.  The T-5 RFP "provided that the government would make award on the basis of a best-value tradeoff considering three factors, which are listed in descending order of importance:  (1) technical/risk; (2) past performance; and (3) price/cost."  GAO Decision at 3 (citing AR at 305–06 (T-5 RFP)).  The RFP further noted DHA "would evaluate . . . small business participation . . . on an acceptable/unacceptable basis."  *Id.*  Offerors "would need to be rated acceptable to be eligible for award."  *Id.*  The T-5 RFP committed DHA to evaluating each factor according to a series of subfactors.  *Id.*

In February 2022, "DHA established a competitive range, including" plaintiff and awardee/defendant-intervenor.  Compl. ¶ 30.  Plaintiff "timely submitted its final revised . . . proposal" on 20 July 2022.  *Id.* ¶ 31.  On 22 December 2022, "DHA notified [plaintiff] that [defendant-intervenor] had been selected for the award."  *Id.* ¶ 32.

### [B.] First GAO Protest and Corrective Action

Plaintiff filed its initial protest with the Government Accountability Office ("GAO") on 17 January 2023 arguing defendant-intervenor "improperly excluded contracts [when calculating its small business participation]."  GAO Decision at 6.

---

[1] The Court refers to plaintiff Health Net Federal Services, LLC alternatively as "plaintiff," "Health Net," and "HNFS" in this Opinion and Order.
[2] The Court refers to the Defense Health Agency alternatively as "DHA" and "the agency" in this Opinion and Order.

Plaintiff contended defendant-intervenor[3] "improperly excluded contracts held by its non-profit owners on the basis that they were affiliates" even though defendant-intervenor's "consortium of [non-profit] owners do not meet the applicable legal definitions of affiliates." *Id.* "Following that protest, [DHA] indicated that it intended to take corrective action by reevaluating the small business participation factor and reopening discussions with respect to that factor." *Id.* GAO therefore "dismissed [plaintiff's first] protest as academic." *Id.* (citing *Health Net Fed. Servs.*, B-421405 (Comp. Gen. Feb. 9, 2023) (unpublished decision)).

Clarifying DHA "intended to use the definition of 'affiliates' at FAR 2.101 . . . [DHA] then permitted offerors to submit new small business plans."[4]  *Id.* Plaintiff "declined to do so," but defendant-intervenor "submitted a new plan," which included "certain categories of subcontracts" defendant-intervenor "previously excluded, but that the solicitation required to be included." GAO Decision at 6. Following discussions with defendant-intervenor after which the DHA contracting officer ("CO") "concluded that [defendant-intervenor] was responsible," DHA "again made award to TriWest on April 20, 2023." *Id.* at 7. Plaintiff then filed its second protest with GAO. GAO Decision at 7.

### [C.]   Second GAO Protest

In its second GAO protest, plaintiff challenged DHA's "evaluation of the technical/management risk, past performance, and small business participation factors . . . [and alleged] that the awardee made several material misrepresentations related to its . . . small business utilization." *Id.* Reviewing "the record to determine whether the agency's evaluation was reasonable and consistent with the stated evaluation criteria and with applicable procurement statutes and regulations," GAO denied all counts of plaintiff's protest. *Id.* at 11, 33 (citing *AECOM Mgmt. Servs., Inc.*, B-417639.2 et al., 2019 CPD ¶ 322 at 9 (Comp. Gen. Sept. 16, 2023)).

*Health Net Fed. Servs., LLC v. United States*, 168 Fed. Cl. 1, 1 (2023).

On 16 August 2023, DHA re-opened its responsibility determination, as a result of Health Net's second GAO protest, to investigate Health Net's allegations "TW improperly excluded its affiliated network subcontractors (owner organizations) from TW's Small Business Subcontracting Plan" and "TW made material misrepresentations regarding its Small Business Subcontracting Plan" "[f]or purposes of responsibility." AR at 58018 (TAB 423) (25 August 2023 Addendum to TriWest's Responsibility Determination); *see* AR at 60638 (TAB 442) (DHA Letter Reopening Responsibility Determination) ("The purpose of this letter is to reopen the responsibility determination for the awardee and ask TW questions to assist the Government in updating its responsibility determination."). On 25 August 2023, DHA found TriWest to be

---

[3] The Court refers to defendant-intervenor TriWest alternatively as "TriWest," "defendant-intervenor," "awardee," and "TW" in this Opinion and Order.
[4] With certain exceptions not relevant here, FAR 2.101 defines "affiliates" as "associated business concerns or individuals if, directly or indirectly either one controls or can control the other; or third party controls or can control both."  FAR 2.101 (2023).

responsible.  AR at 58024 (TAB 423) (25 August 2023 Addendum to TriWest's Responsibility Determination).

## II.    Procedural History

### A.    Plaintiff's Motion to Supplement the Administrative Record

The Court recounted background related to this Motion in its September 2023 Order:

#### [1.]    Court of Federal Claims Protest

Finding no relief from its first two protest attempts, plaintiff filed suit in this Court on 8 August 2023.  *See* Compl.  Concurrently with its Complaint, plaintiff submitted:  (1) a motion for leave to file under seal, ECF No. 3; and (2) a motion for a protective order, ECF No. 4.  Defendant-intervenor filed its Unopposed Motion to Intervene on 9 August 2023, ECF No. 10.  On 10 August 2023, the Court granted defendant-intervenor's Motion to Intervene and scheduled an initial status conference, ECF No. 12.  On 11 August 2023, the parties filed a joint status report, ECF No. 13, proposing a schedule for proceedings in this case and informing the Court of defendants' positions on plaintiff's pending motions.

On 22 August 2023, plaintiff filed its Motion for Discovery and Supplementation of the Administrative Record ("First Mot. for Disc. and Suppl."), ECF No. 30.  On 28 August 2023, plaintiff filed a Supplemental Motion for Discovery and Supplementation of the Administrative Record ("Second Mot. for Disc. and Suppl."), ECF No. 32.  On 1 September 2023, TriWest filed its Opposition to Plaintiff's Motions for Discovery and Supplementation of the Administrative Record ("TriWest's Resp."), ECF No. 41.  The government, also on 1 September 2023, filed a response to plaintiff's motions ("Gov't Resp."), ECF No. 42.  On 7 September 2023, plaintiff filed a reply in support of its Motion for Discovery and Supplementation of the Administrative Record ("Pl.'s Reply"), ECF No. 43.

On 19 September 2023, the Court held oral argument on plaintiff's Motion for Discovery and Supplementation of the Administrative Record and Supplemental Motion for Discovery and Supplementation of the Administrative Record.  *See* Order, ECF No. 47.  On 20 September 2023, the government filed its Unopposed Motion to Amend the Administrative Record, ECF No. 49, with network adequacy report documentation unrelated to plaintiff's earlier motions.[5]

*Health Net Fed. Servs., LLC v. United States*, 168 Fed. Cl. 1, 1 (2023).

On 26 September, the Court denied plaintiff's Motions because "the information requested in plaintiff's motion for discovery and supplementation of the record is [not] required

---

[5] The Court granted the government's Unopposed Motion to Amend the Administrative Record, ECF No. 49.

for the Court to effectively review DHA's actions on the merits." *Id.* at 21, 24 (citing *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1339 (Fed. Cir. 2001)).

### B.     Plaintiff's MJAR and the Government's and Defendant-Intervenor's Cross-MJARs

On 12 October 2023, plaintiff filed its Unopposed Motion to Amend its Complaint, ECF No. 57, attaching its Amended Complaint, ECF No. 57-1, which the Court granted.  On 24 January 2024, plaintiff later re-filed its Amended Complaint ("Am. Compl."), ECF No. 76, at the Court's direction.  On 13 October 2023, plaintiff filed its Motion for Judgment on the Administrative Record ("Pl.'s MJAR"), ECF No. 58.  On 3 November 2023, the government filed its Response and Cross-MJAR ("Gov't's Cross-MJAR"), ECF No. 61, and attached a Declaration of Kenneth P. Yale ("Yale Decl."), ECF No. 61-1.  On the same day, TriWest filed its Response and Cross-MJAR ("TriWest's Cross-MJAR"), ECF No. 62.  On 17 November 2023, plaintiff filed its Reply and Opposition to the government's and TriWest's Cross-MJARs ("Pl.'s Reply"), ECF No. 65, and attached a Declaration of Dr. Joyce Grissom ("Grissom Decl."), ECF No 65-1.  On 1 December 2023, the government filed and TriWest filed replies in support of their cross-motions.  Def.'s Reply to Pl.'s Resp. to Def.'s Cross-MJAR ("Gov't's Reply"), ECF No. 68; Def.-Intervenor's Reply Br. in Support of Its Cross-Mot. for J. ("TriWest's Reply"), ECF No. 69.  On 20 December 2023, the Court held oral argument on plaintiff's MJAR and the defendants' cross-MJARs.  *See* Order, ECF No. 67.

## III.     Parties' MJAR Arguments[6]

### A.     Plaintiff's Argument DHA Irrationally Evaluated TriWest's Revised Proposal Under Factor 4, Small Business Subcontracting

Plaintiff argues:  "TriWest's proposal failed to 'clearly meet' the Solicitation's Factor 4 requirements . . . :  (1) failure to include an accurate calculation of subcontracting spend; (2) failure to identify small businesses in the proposal . . . ; (3) failure to include meaningful participation of small businesses; and (4) failure to demonstrate good faith efforts or plans to meet the Solicitation's subcontracting goals . . . ."  Pl.'s MJAR at 33–34; *see also* Am. Compl. at 83 (Count V).  The government responds "DHA rationally determined that TriWest's revised small business subcontracting plan was acceptable, after reasonably inquiring into TriWest's cost exclusions, rationally accepting some of TriWest's exclusions, requiring TriWest to include certain additional subcontracting costs in its plan, and rationally concluding that TriWest's revised plan was credible and submitted in good faith."  Gov't's Cross-MJAR at 27.  TriWest

---

[6] Plaintiff withdrew Counts VI, VII, and IX through XIII:  "Although HNFS does not concede the lack of merit of any issues in its Complaint, to aid the Court's focus on the most critical flaws in this procurement, HNFS is no longer pursuing Counts VI, VII, and IX through XIII."  Pl.'s MJAR at 3 n.3.  Plaintiff at oral argument conceded its MJAR argument "TriWest Has a History of Misleading DHA, and DHA Failed During the T-5 Competition to Meaningfully Investigate TriWest's Representations," Pl.'s MJAR at 8–20, was not an argument upon which the Court could enter a decision but rather serves as "factual underpinnings."  *See* Tr. at 55:1–15 ("THE COURT: What would be the grounds upon which the Court would make a decision . . . ? . . . [PLAINTIFF:] [I]t is the factual underpinnings of the allegations.  THE COURT:  Okay.  So there's no distinct MJAR argument?  [PLAINTIFF]: As far as a stand-alone, you know, count . . . no.  It is the facts that support the evaluation, investigation, and material misrepresentation allegations.").

argues "plaintiff has failed to show 'hard facts' that DHA's evaluation 'entirely failed to consider an important aspect of the problem.'" TriWest's Reply at 14 (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

First, plaintiff argues "TriWest's proposal did not accurately calculate subcontracting spending" because TriWest "has not removed the subcontract costs from its proposed price already allocated to . . . other-than-small businesses" so "TriWest's other-than-small subcontracting base necessarily must be at least $[XXXXX]." Pl.'s MJAR at 34–35 & 35 n.15. The government responds "'TriWest shifted over $[XXXXX] million in its proposed subcontracting spend from other-than-small to small businesses' when it revised its . . . plan." Gov't's Cross-MJAR at 40–41 (quoting AR at 18155 (TAB 234) (GAO Decision)). TriWest responds "plaintiff's allegation . . . is nothing more than a poor attempt at a sleight-of-hand" because "the numbers in the initial plan are simply not relevant." TriWest Cross-MJAR at 29. Second, plaintiff argues "TriWest's original Factor 4 proposal identified only two small businesses . . . [and d]espite not revising any aspects of its proposal aside from its Factor 4 submission, TriWest now purports to rely on at least 34 new small-business subcontractors." Pl.'s MJAR at 36 (citations omitted). The government responds "TriWest identified specific small businesses that it plans to use for T-5 and the general types of work that each subcategory of small businesses will be performing." Gov't's Cross-MJAR at 39. Specifically, the government contends "[f]or all 32 companies that Health Net identified as appearing in TriWest's technical proposal, . . . TriWest either accounted for those companies as subcontractors during the Factor 4 corrective action discussions or had a legitimate reason for excluding those companies." *Id.* at 42 (citation omitted). Third, plaintiff argues "TriWest [did not] state that small businesses would perform meaningful work." *Id.* at 37. The government responds: "DHA appropriately identified areas of TriWest's small business subcontracting plan that needed to be fixed, and DHA rationally determined that TriWest fixed the issues and submitted an acceptable plan." Gov't's Cross-MJAR at 38. Fourth, "TriWest failed to demonstrate good faith efforts or plans to meet the Solicitation's subcontracting goals to the maximum extent practicable." Pl.'s MJAR at 38. The government responds "[t]he contracting officer rationally concluded that TriWest's small business subcontracting plan was submitted in good faith based upon its identification of specific small business concerns in every required subcategory and its management commitments toward small business." Gov't's Cross-MJAR at 37.

## B.    Plaintiff's Argument TriWest Should Be Disqualified Based on Material Misrepresentations

Plaintiff argues "TriWest submitted its proposal with known impermissible exclusions, known overstated subcontracting goal achievements, and known lack of good faith and received award from DHA . . . [which] is a misrepresentation." Pl.'s MJAR at 48. The government argues "[t]he contracting officer considered documentation from the T-3 procurement, as well as TriWest's explanations for its exclusions, and reasonably determined that TriWest's exclusions were made in good faith." Gov't's Cross-MJAR at 51. Further, the government contends "the 'proper course' would be for the Court to remand to the agency" if TriWest was ineligible for award. *Id.* at 59 (quoting *Walls v. United States*, 582 F.3d 1358, 1367 (Fed. Cir. 2009)). TriWest argues "DHA's acceptance of [TriWest's] explanation [regarding exclusions from its

initial subcontracting plan calculations] . . . was not arbitrary, capricious or irrational." TriWest MJAR at 17 (citing *Logistics Health, Inc. v. United States*, 154 Fed. Cl. 51, 60 (2021)). Plaintiff replies and clarifies its "material misrepresentation allegations are separate and distinct from its challenges to DHA's evaluation findings even though they arise from the same core facts." Pl.'s Reply at 24; Tr. at 129:23–34 ("THE COURT: . . . What's unique about the material misrepresentation argument? [PLAINTIFF]: [What is] unique in particular . . . would be . . . the remedy. . .").

### C. Plaintiff's Argument DHA's Decision Not to Ask Questions or Request Additional Documentation Surrounding Alleged Inconsistencies Was Arbitrary and Capricious

#### 1. TriWest's Affiliates and Level of Control

Plaintiff first argues "DHA's decision to accept at face value TriWest's statements regarding the purported affiliation of its network subcontractors was . . . arbitrary and capricious." Pl.'s MJAR at 26. Plaintiff asserts "[i]f the network subcontractors do not 'control' TriWest, they are required to be considered in TriWest's subcontract spending denominator, meaning that TriWest cannot meet the Solicitation's Factor 4 requirements." *Id.* Plaintiff reasons "based on a mere excerpt of Delaware law that TriWest submitted, DHA concluded . . . [TriWest] 'satisf[ied] the "control" element for "affiliation" under the FAR 2.101 definition'" identified by DHA. *Id.* at 28 (quoting AR at 17180 (TAB 214) (31 May 2023 DHA Memorandum of Law, GAO Protest)). The government responds: "DHA rationally determined that the shareholders are affiliates of TriWest, under the definition of affiliate in FAR 2.101, because they are business concerns that collectively control TriWest." Gov't's Cross-MJAR at 28 (citing AR 18155–58 (TAB 234) (GAO Decision)). TriWest argues "the T-5 procurement was not a 'procurement under this part [FAR Part 19],' *i.e.*, a Small Business set aside procurement, and so it was entirely reasonable for DHA to reject the application of Part 19 to its adoption of the FAR 2.101 definition of 'affiliate.'" TriWest Cross-MJAR at 33.

#### 2. TriWest's Subcontracting Plan

Plaintiff, second, argues "[b]ecause DHA did not ask a single question as to how TriWest added 34 small businesses and billions in subcontracting spending, . . . DHA has no idea what TriWest's actual costs or TriWest's subcontracting spending will be." Pl.'s MJAR at 26. Plaintiff argues "[t]here is not a single mention of DHA's review of any T-3 documentation in the evaluation record even though the Government now admits such review occurred" and "[a]t a minimum, DHA was required to ask further questions before making award." *Id.* at 30. The government responds, "Health Net has not demonstrated any inconsistencies between TriWest's revised small business subcontracting plan and TriWest's technical proposal or price proposal that should have led DHA to inquire further into the accuracy of TriWest's proposal." Gov't's Cross-MJAR at 40. TriWest responds "DHA was not . . . 'required to ask further questions before making award' based on 'the impact of TriWest's representations regarding compliance with FAR 52.219-8, Utilization of Small Business Concerns and FAR 52.219-9, Small Business Subcontracting Plan in connection with TriWest's past performance references.'" TriWest Cross-MJAR at 25 (quoting Pl.'s MJAR at 35–36). Specifically, TriWest contends, "[Health

Net] has not pointed to any evidence of specific inaccuracy concerning TriWest's [submissions] to DHA or in the history cited by TriWest . . . that should have caused the contracting officer to have concerns regarding the administration of TriWest's contracts by a different federal agency." *Id.*

### D. Plaintiff's Argument It was Prejudiced by DHA's Evaluation

Plaintiff argues "[h]ad DHA evaluated TriWest's Factor 4 proposal in accordance with the Solicitation, DHA would not have found that TriWest's proposal 'clearly meets the minimum requirements of the solicitation'—the standard for an 'Acceptable' rating." Pl.'s MJAR at 47 (quoting AR at 5645 (TAB 87) (Final Amendment to T-5 Solicitation)). The government responds: "Health Net erroneously argues that if the shareholders are not TriWest's affiliates, then their subcontracts would have to be included in TriWest's small business subcontracting plan denominator, 'meaning that TriWest cannot meet the Solicitation's Factor 4 requirements.'" Gov't's Cross-MJAR at 33 (quoting Pl.'s MJAR at 26). The government reasons "if TriWest had been unable to add any additional small business subcontracting to its proposal, this would have resulted in a small business goal of 23.48 percent, . . . which is only slightly below the 25 percent goal in the solicitation . . . [and] would not necessarily have been Unacceptable." *Id.* at 33–34 (citations omitted). The government notes "there is no substantial chance that Health Net would have received the . . . award if TriWest had been required to include the shareholder subcontracts in its small business subcontracting plan, and, thus, Health Net has failed to demonstrate prejudice." *Id.* at 34. TriWest responds "plaintiff repeatedly fails to show that DHA erroneously, much less arbitrarily and capriciously, evaluated the parts of the offerors' proposals that are the subjects of HNFS' protest grounds." TriWest's Cross-MJAR at 58.

### E. Plaintiff's Argument DHA's Evaluation of TriWest's Past Performance Regarding Small Business Subcontracting Was Arbitrary and Capricious

Plaintiff argues "DHA did not consider the impact of TriWest's representations regarding compliance with FAR 52.219-8 and FAR 52.219-9 in connection with TriWest's past performance references for the VA PC3, CCN R4, and CCN R5 contracts." Pl.'s MJAR at 40. The government responds: "[t]he performance evaluations for TriWest's relevant VA contracts indicate that TriWest's small business subcontracting was satisfactory, and DHA was not required to seek further information to try to undercut the VA's evaluations." Gov't's Cross-MJAR at 23.

### F. Plaintiff's Argument DHA's Evaluation of TriWest's Network Under the Technical/Risk Factor Was Arbitrary and Capricious[7]

Plaintiff argues "DHA's evaluation of TriWest's proposal . . . with respect to both technical merit and technical risk was inconsistent with the Solicitation and was arbitrary and capricious." Am. Compl. at 91 (Count VIII). Plaintiff asserts: "TriWest concealed the extent to which its purported 'Federal Network' was actually the patchwork of its leased subcontractors' networks." Pl.'s MJAR at 44. Plaintiff argues "DHA had the opportunity to investigate further

---

[7] Plaintiff at oral argument noted this argument was not related to its arguments about DHA's evaluation of Factor 4. Tr. at 30:12–16 ("THE COURT: Count 8, 'DHA's evaluation of TriWest's technical merit and technical risk under Factor 1 deviated from the RFP.' [PLAINTIFF]: . . . [T]hat's not related to the 25 percent [argument].").

to allow it to conduct an informed evaluation . . . [b]ut, DHA chose not to do so." *Id.* at 46.  The government responds:  "TriWest's technical proposal clearly described how it will build its T-5 network, and . . . TriWest did not merely offer 'to cobble together a patchwork of numerous small networks of its subcontractors.'"  Gov't's Cross-MJAR at 20 (Pl.'s MJAR at 44).  The government notes "TriWest's proposal reflects that it has used network subcontractors to help populate its existing Federal Network . . . [but] TriWest has developed its own accredited Federal Network that it can draw from for its T-5 network." *Id.* at 20–21.  TriWest responds its "proposal explained how it would leverage its existing contractual relationships with providers in that network by having those 'contracted and credentialed.' Federal Network providers also agree to provide services under the T-5 contract."  TriWest's Cross-MJAR at 55 (quoting AR at 55145 (TAB 383) (TriWest Proposal)).

### G.   Plaintiff's Argument DHA's Responsibility Determination Was Arbitrary and Capricious

Plaintiff argues "[i]f DHA had concerns regarding TriWest's responsibility . . . DHA was required to terminate the award."  Pl.'s MJAR at 42.  The government responds:  "the contracting officer conducted a reasonable investigation under the circumstances and rationally determined that TriWest has a satisfactory record of integrity and business ethics."  Gov't's Cross-MJAR at 48.  TriWest responds:  "DHA's contracting officer considered the applicable standards and made appropriate independent judgments regarding TriWest's 'responsibility' . . . concerning TriWest's Small Business Subcontracting Plans."  TriWest Cross-MJAR at 46.

### H.   Plaintiff's Declaratory and Injunctive Relief Argument

Plaintiff argues "HNFS is entitled to injunctive relief setting aside the award to TriWest" because "permanent injunction is the only remedy for DHA depriving HNFS of a fair opportunity to compete under the Solicitation."  Pl.'s MJAR at 48–49.  The government responds:  "the Court could remand to DHA with instructions to re-evaluate TriWest's proposal in accordance with the Court's opinion . . . if the Court were to determine that DHA committed a prejudicial error by failing to reasonably evaluate TriWest's small business subcontracting plan."  Gov't's Cross-MJAR at 57.

## IV.   Legal Standards

### A.   Bid Protest Jurisdiction and APA Review

The Tucker Act, as amended by the Administrative Dispute Resolution Act ("ADRA") provides this court jurisdiction over "action[s] by an *interested party* objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation *in connection with* a procurement or a proposed procurement."  Administrative Dispute Resolution Act, Pub. L. No. 104-320, 28 U.S.C. § 1491(b)(1) (1996) (emphasis added).  The term "interested party" means "actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract."  *Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001).  "[T]o prevail in a protest the protester must

show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996). "[T]he Federal Circuit has held that '[t]he operative phrase "in connection with" is very sweeping in scope.'" *Space Expl. Techs. Corp. v. United States*, 144 Fed. Cl. 433, 439–40 (2019) (quoting *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999)). Though this court's bid protest jurisdiction is broad, it nevertheless "is exclusively concerned with procurement solicitations and contracts." *Res. Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1245 (Fed. Cir. 2010).

The Court evaluates bid protests under the framework laid out in Section 706 of the Administrative Procedure Act.[8] 28 U.S.C. § 1491(b)(4); *see also Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). "[T]he proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350–51 (Fed. Cir. 2004) (quoting *Adv. Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057–58 (Fed. Cir. 2000)). An agency's action is arbitrary, capricious, or an abuse of discretion if "the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or . . . is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Since the arbitrary and capricious standard is "highly deferential," a reviewing court must "sustain an agency action evincing rational reasoning and consideration of relevant factors." *Adv. Data Concepts*, 216 F.3d at 1058 (citing *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)). A court, therefore, will not "substitute its judgment" for the agency's so long as the agency's decision was reasonable. *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 998–99 (Fed. Cir. 2018) (quoting *R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1322 (Fed. Cir. 2003)).

B.     **Judgment on the Administrative Record in a Bid Protest**

"[Rule] 52.1(c) [of the Rules of the United States Court of Federal Claims ('RCFC')] provides for judgment on the administrative record." *Huntsville Times Co. v. United States*, 98 Fed. Cl. 100, 104 (2011); *see also Bannum, Inc. v. United States*, 404 F.3d 1346, 1353–54 (Fed.

---

[8] "The Tucker Act, as amended by ADRA, requires the COFC in a bid protest case to apply the APA's standard of review, pursuant to which government agency action is reviewed to determine whether it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or 'without observance of a procedure required by law.'" Matthew H. Solomson, Court of Federal Claims: Jurisdiction, Practice, and Procedure § 8-37 (2016) (footnote omitted) (first citing 28 U.S.C. § 1491(b)(4); and then quoting 5 U.S.C. § 706(A), (D)); 28 U.S.C. § 1491(b)(4) (2024) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.")); *Res. Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1243 (Fed. Cir. 2010) (noting "[t]he ADRA also directed the court to use the standards of review provided by the APA in reviewing the bid protest suits" (citing 28 U.S.C. § 1491(b)(4))); *Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1300 (Fed. Cir. 2001) ("[W]hile pre-ADRA protests brought in the Court of Federal Claims were governed by a narrow standard of review . . . the ADRA expressly made the APA standard of review applicable to all bid protest actions . . . ." (citations omitted)).

Cir. 2005).  The court may set aside an agency action if plaintiff has proven "either:  (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Garufi*, 238 F.3d at 1332.  The rational basis test requires the court to ask "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion."  *Dell Fed. Sys., L.P.*, 906 F.3d at 992 (quoting *Banknote Corp. of Am., Inc.*, 365 F.3d at 1351).  "When a challenge is brought on the second ground, the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'"  *Garufi*, 238 F.3d at 1333 (quoting *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).  "*[D]e minimis* errors do not require the overturning of an award."  *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996).  "De minimis errors are those that are so insignificant when considered against the solicitation as a whole that they can safely be ignored and the main purposes of the contemplated contract will not be affected if they are."  *Id.* (quoting *Andersen Consulting v. United States*, 959 F.2d 929, 935 (Fed. Cir. 1992)).  A bid protest plaintiff must establish alleged "errors in the procurement process significantly prejudiced" plaintiff by showing "there was a 'substantial chance' it would have received the contract award but for the errors."  *Bannum*, 404 F.3d at 1353 (quoting *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)).

### C.    Permanent Injunction

When deciding whether a permanent injunction is warranted, a court considers:

> (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

*PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004).

### V.    Whether DHA's Evaluation of TriWest's Proposal Under Factor 4, Small Business Participation, Was Arbitrary and Capricious and Whether TriWest Materially Misrepresented Its T-5 Subcontracting[9]

The Court will address together Count V (whether DHA's evaluation of TriWest's Proposal under Factor 4, small business participation, was arbitrary and capricious) and Count I (whether TriWest materially misrepresented the total estimated value of its planned T-5 subcontracting spending and subcontracting commitments), as plaintiff acknowledged Count V is a "parallel" of Count I.  Am. Compl. at 71, 82; Tr. at 30:2–3 (" [PLAINTIFF]: [Count V] is a parallel, Your Honor, of the misrepresentation component . . . .").

---

[9] The Court addresses various agency actions plaintiff alleges were arbitrary, capricious, or otherwise not in accordance with law.  *See* 28 U.S.C. § 1491(b)(4) (2024).  Ultimately, whether these actions were prejudicial, however, is key to determining whether the agency's award to TriWest was proper.  *See infra* Section VII (discussing the parties' prejudice arguments ultimately hinging on whether the Solicitation's Small Business Subcontracting 25 percent goal is a strict requirement for award; for Health Net to prove prejudice, it must show Health Net had a substantial chance of receiving the award, which is much more likely if the goal was not a strict requirement.).

The Court confirmed with the parties the Solicitation's small business subcontracting requirements and TriWest's purported satisfaction of those requirements in its proposal. Tr. at 7:7–20:7. The parties agreed the Solicitation contained a 25 percent goal (or requirement) for small business subcontractors. Tr. at 7:14–17 ("[THE COURT:] [T]he solicitation has either a goal or a requirement for 25 percent . . . to be small business subcontractors, correct? [PLAINTIFF]: That is correct, Your Honor."); *see also* AR at 5645 (TAB 87) (Final Amendment to T-5 Solicitation) ("The Subcontracting goals are as follows: Small Business Subcontracting: 25%"). The parties also agreed an offeror reaches the 25 percent requirement by dividing the number of small business subcontractors by the total included subcontractors. Tr. at 7:18–22 ("THE COURT: . . . [T]o arrive at that 25 percent number, the numerator is the small business subcontractors that an offeror submits. The denominator is the total included subcontractors, correct? [PLAINTIFF]: That's correct, Your Honor."); *see also* AR at 13990 (AB 150) (TriWest Revised Small Business Plan). TriWest omitted its "Affiliates" from its total subcontractors in its proposal. Tr. at 8:2–5 ("[THE COURT:] TriWest alleges that affiliates should be subtracted from total included subcontractors. [PLAINTIFF]: That is one of those exclusions that TriWest has identified . . . ."); *see* AR at 7331–34 (TAB 102) (TriWest Proposal); AR at 13954 (DHA and TriWest EN 01 Discussions). The government noted such an exclusion is permissible under the Solicitation: "[GOVERNMENT:] I don't think Health Net disputes . . . that . . . affiliated subcontractors can be excluded from the subcontracting denominator. The question at issue is whether or not . . . the shareholders are affiliates of TriWest." Tr. at 12:4–10. Whether TriWest's shareholders are "affiliates" ultimately controls whether TriWest's proposal strictly meets the 25 percent small business subcontracting goal, because DHA cannot award the contract to an offeror if it has an "Unacceptable" proposal under the Factor 4, Small Business Participation Subcontracting portion of the Solicitation. Pl.'s MJAR at 4 ("Factor 4, Small Business Participation required DHA to evaluate proposals on a pass/fail basis. . . . If a proposal did not 'clearly meet' the Solicitation's requirements, DHA was required to find the offeror ineligible for award. . . . The Solicitation listed the subcontracting goals including 25% for overall small business subcontracting." (citing AR at 5645 (TAB 87) (Final Amendment to T-5 Solicitation)); Gov't Cross-MJAR at 33 ("[I]f TriWest had been unable to add any additional small business subcontracting to its proposal, this would have resulted in a small business goal of 23.48 percent, . . . which is only slightly below the 25 percent goal in the solicitation. . . . [A] small business subcontracting goal of 23.48 would not necessarily have been Unacceptable."). The Court will therefore analyze whether TriWest's shareholders are affiliates to determine if TriWest's proposal strictly meets the 25 percent goal.

The term "Affiliates" first arose in corrective action discussions between TriWest and DHA. Tr. at 15:9–13 ("THE COURT: . . . DHA in [EN 01 discussion] question 4 introduces the term 'affiliate' from FAR 52.219-9(1) . . . . [GOVERNMENT]: I think so."); Tr. at 16:5–15 ("[GOVERNMENT:] DHA did ask about affiliates in the first corrective action question, and I think that . . . probably comes from arguments that Health Net was making to determine whether any of these exclusions involved . . . affiliates . . . ."). As part of contract discussions, DHA clarified FAR 2.101 applies to this procurement in defining "Affiliates": "DHA has determined the definition of 'Affiliate' in FAR 2.101 is more appropriate than the definition at FAR 52.219-9(1) to define the entities that may be excluded from subcontractor status within an offeror's Small Business Subcontracting Plan." AR at 13985–86 (DHA and TriWest EN 01 Discussions).

TriWest stated its affiliates satisfy the FAR 2.101 definition:

> [T]he TriWest shareholder entities should be considered "affiliates" within the FAR 2.101 definition and their planned work as Network Subcontractors may be excluded from subcontractor status within the Small Business Subcontracting Plan. The shareholder entities "control" TriWest by virtue of their legal relationships to TriWest.

AR at 13986 (DHA and TriWest EN 02 Discussions).  FAR 2.101 defines "affiliates" as "business concerns" requiring "control":

> *Affiliates* means associated business concerns or individuals if, directly or indirectly either one controls or can control the other; or third party controls or can control both, except as follows:
>
> (1) For use in subpart 9.4, see the definition at 9.403.
>
> (2) For use of affiliates in size determinations, see the definition of "small business concern" in this section.

FAR 2.101 (2023) (Definitions).  In its response during corrective action, TriWest stated its affiliates satisfy the FAR 2.101 definition under Delaware state law:

> The shareholder entities "control" TriWest by virtue of their legal relationships to TriWest. . . .
>
> Specifically, [title 8, section 351 of the Delaware Code], states:
>
>> The certificate of incorporation of a close corporation may provide that the business of the corporation shall be managed by the stockholders of the corporation rather than by a board of directors. . . .
>> . . . .
>
> TriWest Healthcare Alliance Corp.'s (TriWest) parent company, TriWest Alliance, Inc. (Alliance) elected to insert such a provision in its Articles of Incorporation ("Articles"), which . . . states in relevant part:
>
>> The business and affairs of the Corporation shall be managed by or under the direction of the stockholders of the Corporation rather than by a board of directors. Each of the stockholders shall designate one or more persons who are authorized to act on behalf of such stockholder with respect to such stockholder's rights to participate in the management and direction of the business and affairs of the Corporation.

That governance structure also flows down to TriWest as a wholly-owned subsidiary. Therefore, each shareholder is responsible for the management and direction of both Alliance and the subsidiary, TriWest. The shareholders are by law the Directors of TriWest, and there are no Directors on TriWest's board who are independent of the shareholder entities. Each shareholder is represented by an executive from their own organizational management structure who participates in TriWest's board meetings, and each may have other members of their management structures that participate in committees organized and approved by the board. As a result, TriWest's shareholders are all responsible for the control of the organization, regardless of the number or percentage of shares owned.

AR at 13986–87 (DHA and TriWest EN 02 Discussions). Plaintiff agreed at oral argument FAR 2.101 applies to this Solicitation, but alleges "[it is] a factual question as to whether or not the entities that TriWest has identified are properly defined as affiliates," in part by looking to other FAR provisions. Tr. at 17:21–24. Plaintiff argues "the question of control becomes a legal question as well as a factual issue here." Tr. at 18:11–13. The government agreed: "THE COURT: . . . [I]t's a question of fact as to whether [affiliates] do control and as well as a question of law regarding the legal entities? [GOVERNMENT]: Yes." Tr. at 19:19–22. Both parties agreed DHA was permitted to look to Delaware law in determining whether TriWest met the definition of affiliates. Tr. at 19:1–5 ("THE COURT: So it's fair to look to Delaware corporate law? [PLAINTIFF]: Yes, Your Honor. . . . [GOVERNMENT]: Yes, Your Honor.").

### A.    Whether DHA's Evaluation of TriWest's Proposal Under Factor 4, Small Business Participation, Was Arbitrary and Capricious

Plaintiff argues: "TriWest's proposal failed to 'clearly meet' the Solicitation's Factor 4 requirements in at least four separate instances: (1) failure to include an accurate calculation of subcontracting [costs]; (2) failure to identify small businesses in the proposal that will be performing under the contract; (3) failure to include meaningful participation of small businesses; and (4) failure to demonstrate good faith efforts or plans to meet the Solicitation's subcontracting goals to the maximum extent practicable." Pl.'s MJAR at 33–34; *see also* Am. Compl. at 83 (Count V). The Court will address each of these four allegations in turn.

### 1.    Subcontracting Spending

Plaintiff asserts "TriWest's proposal did not accurately calculate subcontracting spending as required by the Solicitation and FAR 19.704(a)(2)" and "[t]here is nothing in the record that supports the accuracy of either TriWest's total dollars planned to be subcontracted or TriWest's total dollars planned to be subcontracted to small business." Pl.'s MJAR at 34. Plaintiff states "[t]here is a difference of more than a billion dollars between TriWest's Volume IV Cost/Price FPR (AR Tab 384) and its revised small business plan (AR Tab 150)." *Id.* Plaintiff argues TriWest "has not removed the subcontract costs from its proposed price already allocated to its massive team of other-than-small businesses," so "TriWest's other-than-small subcontracting base necessarily must be at least $[XXXXX] ($[XXXXX] + $[XXXXX]B+ $[XXXXX]M = $[XXXXX])"—rather than $[XXXXX]. *See* Pl.'s MJAR at 35; AR at 13992 (TAB 150) (TriWest EN 02 Discussions and Revised Small Business Plan). "Considering that $[XXXXX]

- 15 -

figure in conjunction with TriWest's revised 'Total Subcontracted Dollars' calculation of $[XXXXX], all that remains available for TriWest to subcontract to small businesses is a maximum of $[XXXXX] ([XXXXX]% of TriWest's total subcontracting spend), grossly short of the [XXXXX]% TriWest claims in its proposal and the number DHA relied upon in the evaluation." *Id.* at 35–36. "DHA undertook no comparison of the dollars or entities identified in the Factor 4 proposal with the rest of TriWest's proposal at all." *Id.* at 36.

The government responds "Health Net's math ignores that 'TriWest shifted over $[XXXXX] million in its proposed subcontracting spend from other-than-small to small businesses' when it revised its small business subcontracting plan." Gov't's Cross-MJAR at 40–41 (citing AR at 18155 (TAB 234) (GAO Decision)). The government argues "this shift does not create a *per se* inconsistency between TriWest's technical proposal and revised small business subcontracting plan." *Id.* at 41. The government reasons "[a]s GAO recognized, shifting ancillary support services from large businesses to small businesses would not necessarily affect TriWest's technical proposal . . . [and] the solicitation did not require offerors to identify subcontractors in their technical proposals." *Id.* at 41. The government argues "Health Net has not identified any inconsistency between TriWest's price proposal and revised small business subcontracting plan and, even if there was an inconsistency, it was not material." *Id.* at 44. TriWest responds "plaintiff's allegation that 'TriWest's other-than-small subcontracting base necessarily must be at least $[XXXXX]' is nothing more than a poor attempt at a sleight-of-hand" because "the numbers in the initial plan are simply not relevant." TriWest Cross-MJAR at 29 (quoting Pl.'s MJAR at 41).

Here, the CO acknowledged TriWest's initial proposal did not meet Factor 4 requirements, which is why DHA engaged in comprehensive corrective action:

> After initially evaluating Factor 4, I became aware TriWest may have excluded some amount of subcontracted dollars from its total subcontracted dollars used to calculate its small business subcontracting percentages. Our discussions conducted in corrective action confirmed subcontracted dollars were excluded in the initial plan but were included in its revised plan submitted as a formal proposal revision.

AR at 14025 (TAB 160) (DHA's Review of TriWest's Revised Proposal). TriWest initially proposed a subcontracting plan with approximately $[XXXXX] million[10] for other-than-small businesses, or large business spending. *See* AR at 7331 (TAB 102) (TriWest Proposal) ("Total value of projected subcontracts: $[XXXXX].."). During corrective action, TriWest provided an updated Small Business Plan during corrective action "to satisfy the applicable requirements of . . . FAR . . . clause 19.704 Subcontracting Plan requirements and FAR clause 52.219-9, Small Business Subcontracting Plan":

---

[10] TriWest's initial proposal does not explicitly state it will dedicate $[XXXXX] million to its other-than-small businesses, but it does state it would dedicate $[XXXXX] to subcontracts in total. AR at 7331 (TAB 102) (TriWest Proposal). Plaintiff argued in its GAO briefing: "TriWest initially relied on an overarching 25% small business subcontracting goal applied against its $[XXXXX] subcontracting base, meaning that its original plan identified $[XXXXX] (75%) in other than small business subcontracting." AR at 17981 (TAB 232) (Health Net's Comments on the Supplemental Agency Report at the GAO) (citing AR at 7331 (TAB 102) (TriWest Proposal)). GAO accepted this math in its decision as accurate: "the protester notes that TriWest initially proposed subcontracting approximately $[XXXXX] million to other-than-small businesses." AR at 18154 (TAB 234) (GAO Decision).

**Exhibit 7-12: Contract Total**

| Planned Subcontracting by Business Size | Percentage | Dollars |
|---|---|---|
| Total Subcontracted Dollars | 100.0% | |
| Other than Small Businesses | 75.0% | |
| Small Businesses (SB) | 25.0% | |
| Veteran-Owned Small Businesses (VOSB) | 4.2% | |
| Service-Disabled Veteran-Owned Small Businesses (SDVOSB) | 4.1% | |
| Small Disadvantaged businesses (including ANCs and Indian tribes) Small Businesses (SDB) | 5.0% | |
| Women-Owned Small Businesses (WOSB) | 5.0% | |
| HUBZone Small Businesses (HUB) | 3.0% | |
| The AbilityOne Program (National Industry for the Blind/ SourceAmerica) Small Businesses | 1.0% | |

**Figure 1**

AR at 13989, 13992 (TAB 150) (TriWest EN 02 Discussions and Revised Small Business Plan). TriWest's estimated subcontracting total in its revised proposal is $[XXXXX]. AR at 13990 (TAB 150) (TriWest EN 02 Discussions and Revised Small Business Plan). TriWest's estimated Small Business Subcontracting in its revised proposal is $[XXXXX]. *Id.* TriWest's estimated "Other than Small Business" subcontracting in its revised proposal is $[XXXXX]. *Id.* After reviewing TriWest's revised plan following the conclusion of corrective action, DHA stated: "the Government is confident TriWest's revised proposal now includes all of the subcontracted dollars required to be included under the T-5 solicitation." AR at 14025 (TAB 160) (DHA's Review of TriWest's Revised Proposal). The CO stated in its final assessment: "[a]fter a comprehensive review of the Offeror's subcontracting plan in accordance with RFP M.10. and considering that the Offeror has proposed a small business subcontracting plan consistent with L.5.2, and proposing goals meeting and exceeding those established under M.10.2, as well as the Offeror's plan to maximize small business participation under the award, I have assessed the following rating for the Offeror: . . . ACCEPTABLE." *Id.*

As an initial matter, plaintiff's general argument "DHA undertook no comparison of the dollars or entities identified in the Factor 4 proposal with the rest of TriWest's proposal at all," Pl.'s MJAR at 26, is meritless because DHA undertook comprehensive corrective action as to TriWest's Factor 4 proposal, inquired about TriWest's Small Business Plan, and assessed its revised proposal. *See* AR at 13976–14004 (TAB 150) (TriWest EN 02 Discussions and Revised Small Business Plan); AR at 14025 (TAB 160) (DHA's Review of TriWest's Revised Proposal). DHA assessed TriWest's revised proposal and concluded it was acceptable. AR at 14025 (TAB 160) (DHA's Review of TriWest's Revised Proposal). It is unclear how DHA "undertook *no* comparison" in light of this corrective action. *See* Pl.'s MJAR at 36 (emphasis added); AR at 13976–14004 (TAB 150) (TriWest EN 02 Discussions and Revised Small Business Plan); AR at 14025 (TAB 160) (DHA's Review of TriWest's Revised Proposal).

Plaintiff next takes issue with TriWest's revised total dollars planned to be subcontracted to small business and, more specifically, its other-than-small subcontracting base. Pl.'s MJAR at 34. Plaintiff alleges TriWest's other-than-small subcontracting base "necessarily must be at least $[XXXXX] ($[XXXXX] + $[XXXXX]B+ $[XXXXX]M = $[XXXXX])" because TriWest "has not removed the subcontract costs from its proposed price already allocated to its massive team of other-than-small businesses." Pl.'s MJAR at 35. Plaintiff's ultimate argument is DHA should

have disqualified TriWest because Health Net's suggested other-than-small subcontracting base of $[XXXXX] divided by TriWest's total subcontracted dollars of $[XXXXX] does not lead to the 25 percent Solicitation goal needed for small business spending:

$$\frac{\$[XXXXX]}{\$[XXXXX]} \;=\; [XXXXX]\%$$

*See id.* at 35–36.  Health Net's calculations are based primarily on TriWest's *initial* proposal, which included approximately $[XXXXX] million to other-than-small businesses, or large business spending.  *See* AR at 7331 (TAB 102) (TriWest Proposal) ("Total value of projected subcontracts: $[XXXXX].").  Plaintiff at oral argument attempted to parallel TriWest's T-3 proposal from 2008 with TriWest's initial and revised proposals for T-5 to demonstrate "the numbers are inaccurate."  Tr. at 97:16–23 ("[PLAINTIFF]:  There are sort of multiple problems, Your Honor.  The numbers are inaccurate . . . .  THE COURT: . . .  [I]s it that the numbers are inaccurate now and TriWest is citing past historical numbers that are inaccurate for the same reasons?  [PLAINTIFF]:  Correct, Your Honor."); *see infra* Section VIII (addressing T-3 with respect to plaintiff's past performance under Veterans Affairs (VA) contracts).  While Health Net's math may have been valid under TriWest's initial proposal, TriWest's final proposal cannot support Health Net's calculation here.[11]  In TriWest's revised small business subcontracting plan, TriWest moved $[XXXXX] million from other-than-small businesses to small businesses.  *See* AR at 13989–92 (TAB 150) (TriWest EN 02 Discussions and Revised Small Business Plan).  This shift reduced TriWest's other-than-small subcontracting base to $[XXXXX] and increased its Small Business Subcontracting Plan to $[XXXXX].  *Id.*  The government describes the shift as one "away from large businesses, such as facilities and maintenance, postage handling, and printing and supplies."  Gov't Cross-MJAR at 41.

For Health Net to allege the TriWest's subcontracting shift was improper, it must plausibly show either:  (1) $[XXXXX] million shifted to small business subcontractors did not, in fact, include small businesses; or (2) the CO should have suspected the shift was improper and requested more information from the agency.  Health Net is indeed correct TriWest's revised proposal and its responses during corrective action provide little insight on the details of its subcontracting shift.  For example, TriWest does not explicitly indicate which small business subcontractors would receive the shifted $[XXXXX] million.  Only one chart in TriWest's revised proposal provides any detail on the allocation of the $[XXXXX] million, when compared to the initial proposal:

---

[11] As the GAO noted, "[t]he problem with [Health Net's] argument is that it would require the agency to ignore what TriWest actually proposed."  AR at 18155 (TAB 234) (GAO Decision).

**Exhibit 7-9: Subcontracted Principal Products and Services**

| Product/Service Area | Small Business Concerns | Small Disadvantaged Business Concerns | Women-Owned Small Business Concerns | Veteran-Owned Small Business Concerns | Service-Disabled Veteran-Owned Small Business Concerns | HUBZone Small Business Concerns | Ability One | Large Business Concerns |
|---|---|---|---|---|---|---|---|---|
| Claims Processing / Fiscal Intermediary | | | | | | | | X |
| Labor (Purchased) * | X | X | X | X | X | | | X |
| Consulting | X | X | X | X | X | | | X |
| Other Professional Services | X | X | X | | | | | X |
| Recruiting & Training | X | | X | X | X | | | X |
| Facilities & Maintenance | X | X | X | X | X | X | | X |
| Security & Storage | X | | X | | | | | X |
| Postal Handling Fees | X | X | | | | | | X |
| Printed Matter & Promotional Materials | X | X | | | | X | | X |
| Printing & Supplies | X | X | X | | | X | | X |
| Insurance (Corporate) | X | | | | | | | X |
| Equipment | X | X | X | X | | | | X |
| Computer Support | X | X | X | X | X | X | | X |
| Capital Asset Purchases | X | X | X | X | X | X | | X |
| Clinical Support | X | | X | X | | | | X |
| Other | X | X | X | X | | X | X | X |

**Figure 2A:  TriWest's Initial Proposal**

**Exhibit 7-13: Subcontracted Principal Products and Services**

| Product/Service Area | Small Business Concerns | Small Disadvantaged Business Concerns | Women-Owned Small Business Concerns | Veteran-Owned Small Business Concerns | Service-Disabled Veteran-Owned Small Business Concerns | HUBZone Small Business Concerns | Ability One | Large Business Concerns |
|---|---|---|---|---|---|---|---|---|
| Claims Processing / Fiscal Intermediary | | | | | | | | X |
| Labor (Purchased) / External Staffing Subcontractors (non-employees) | X | X | X | X | X | | X | |
| Consulting | X | X | X | X | | | | X |
| Other Professional Services | X | X | X | | | | | X |
| Recruiting & Training | X | X | X | X | | | | X |
| Facilities & Maintenance | X | X | X | X | X | | | |
| Security & Storage | X | | X | X | | | | |
| Postal Handling Fees | X | X | | | | | | |
| Printing & Supplies | X | X | X | | X | X | X | |
| Equipment | X | X | X | X | X | | | |
| Computer Support | X | X | X | X | X | | | X |
| Capital Asset Purchases | X | X | X | X | X | | | |
| Clinical Support | X | X | X | X | X | | | X |

**Figure 2B:  TriWest's Revised Proposal**

*Compare* AR at 7334 (TAB 102) (TriWest's Proposal), *with* AR at 13993 (TAB 150) (TriWest EN 02 Discussions and Revised Small Business Plan).  The revised chart, without detailing precise monetary allocation, indicates TriWest moved subcontracts away from "Large Business Concerns" in seven categories:  Labor (Purchased)/External Staffing, Facilities & Maintenance, Security & Storage, Postal Handling Fees, Printing & Supplies, Equipment, and Capital Asset Purchases.  *See* AR at 13993 (TriWest's Revised Proposal).  This shift consequently reduced TriWest's other-than-small subcontracting base to $[XXXXX] and permitted TriWest's revised proposal to nominally meet the Solicitation's 25 percent goal:

$$\frac{\$[XXXXX]}{\$[XXXXX]} \ = \ 75\%$$

AR at 13989–92 (TAB 150) (TriWest EN 02 Discussions and Revised Small Business Plan). The lack of precise monetary allocation alone, however, is not sufficient to conclude the $[XXXXX] million was improperly reallocated—or DHA should have been on notice of improper reallocation—particularly when the revisions were made in response to DHA's inquiries during corrective action. *Harmonia Holdings Grp., LLC v. United States*, 999 F.3d 1397, 1405–06 (Fed. Cir. 2021) ("[A] contracting officer is generally entitled to rely on a contractor's certifications. . . . [B]ecause the question of whether an ostensible subcontractor relationship exists can only be resolved after a detailed assessment of numerous factors related to whether a prime contractor is unusually reliant on its subcontractor, the existence of such a relationship can rarely be gleaned simply by examining the face of an offeror's proposal.").

During corrective action, the agency reviewed TriWest's revised list of subcontracting spending in accordance with the Solicitation's terms during corrective action and provided an "Acceptable" rating:  "the Government is confident TriWest's revised proposal now includes all of the subcontracted dollars required to be included under the T-5 solicitation."  AR at 14025 (TAB 160) (DHA's Review of TriWest's Revised Proposal).  DHA specifically included the following review of TriWest's subcontracting plan details within TriWest's revised proposal in addition to rating TriWest's proposal as "Acceptable" overall:

| L.5.2. | Subcontracting Plan Details | Acceptable | Unacceptable |
|---|---|---|---|
| (2) | A statement of the total dollars planned to be subcontracted and a statement of the total dollars planned to be subcontracted to small business | X | |

**Figure 3**

AR at 14024 (DHA's Review of TriWest's Revised Proposal).  Although Health Net alleges TriWest "offered no explanation as to what changed between its initial proposal and FPR," Pl.'s MJAR at 36, TriWest's revised proposal clearly indicates an updated list of services for which TriWest would not use "Large Business Concerns."  *See* AR at 13993 (TAB 150) (TriWest EN 02 Discussions and Revised Small Business Plan).  TriWest further provided a list of other-than-small business contractors and their corresponding categories of performance.  *See infra* Section V.A.2–3; AR at 13958–59 (TAB 146) (TriWest EN 01 Discussions); AR at 13997–98 (DHA and TriWest Corrective Action EN 01 Discussions).  Taken together, the updated subcontracting plan and the list of "other-than-small" subcontractors are sufficient to support TriWest's planned subcontracting goals.  Health Net has not shown why the updated subcontracting value (approximately $[XXXXX] million) is unsupported nor why the CO should have been on notice of potential impropriety to require additional information, such as detailed allocation information.  The agency did not request such detailed information, and Health Net has failed to show the agency was arbitrary or capricious in relying on TriWest's revised subcontracting plan.[12]  *See* FAR 15.404-1(a)(1) ("The complexity and circumstances of each acquisition should

---

[12] Regarding the $[XXXXX] million TriWest shifted to achieve its revised $[XXXXX] million Small Business Subcontracting, the GAO went into additional detail in its opinion, stating the shift in subcontracting dollars is "ancillary" to the technical proposal and accordingly would not affect the technical proposal, which "principally focused on network and clinical management, healthcare administration, customer service, and claims processing."

determine the level of detail of the analysis required."); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001); *Harmonia*, 999 F.3d at 1405–06. Accordingly, DHA's decision was not arbitrary and capricious because "the procurement official's decision [did not] lack[] a rational basis" in thoroughly reviewing TriWest's Small Business Subcontracting Plan and, specifically, its planned subcontracting spending. *Garufi*, 238 F.3d at 1332.

## 2.    Number of Small Business Subcontractors

Plaintiff next argues "TriWest's original Factor 4 proposal identified only two small businesses—[XXXXX] and [XXXXX] . . . [and d]espite not revising any aspects of its proposal aside from its Factor 4 submission, TriWest now purports to rely on at least 34 new small-business subcontractors." Pl.'s MJAR at 36, 14 n.6 ("These companies were [XXXXX], [XXXXX], [XXXXX], [XXXXX], [XXXXX], [XXXXX], [XXXXX], [XXXXX], [XXXXX], [XXXXX], [XXXXX], [XXXXX], [XXXXX], [XXXXX], [XXXXX], [XXXXX], [XXXXX], [XXXXX], [XXXXX], [XXXXX], [XXXXX], [XXXXX], [XXXXX], [XXXXX], [XXXXX], [XXXXX], [XXXXX], [XXXXX], [XXXXX], [XXXXX], and [XXXXX]." (citing AR TAB 383 (TriWest Proposal))). Plaintiff reasons "[p]roviding a list of small business entities is not equivalent to identifying businesses for purposes of small business subcontracting to support the TRICARE contract." Pl.'s MJAR at 36. The government responds "TriWest's omission of certain companies from its lists of subcontractors during corrective action discussions does not demonstrate any inconsistency between TriWest's technical proposal and its revised small business subcontracting plan." Gov't's Cross-MJAR at 42. Specifically, "[f]or all 32 companies that Health Net identified as appearing in TriWest's technical proposal, . . . TriWest either accounted for those companies as subcontractors during the Factor 4 corrective action discussions or had a legitimate reason for excluding those companies from its small business subcontracting plan." *Id.* at 42.

TriWest's revised submission satisfied the Solicitation because the Solicitation only required offerors to submit its "subcontracting plan," AR at 5645 (TAB 87) (Final Amendment to T-5 Solicitation), and TriWest provided both a plan and—during corrective action—a list of subcontractors in response to DHA's request to "provide a list of all anticipated subcontractors (both small and other than small businesses) as well as what function they will perform." AR at 13959 (TAB 146) (TriWest EN 01 Discussions).   The government explains:

---

AR at 18160 n.12 (TAB 234) (GAO Decision); *see* AR at 13993 (TAB 150) (TriWest's Revised Proposal) (listing the service categories of small business subcontractors).  GAO determined DHA's assessment was proper because the shift in $[XXXXX] million of subcontracting "principally include[d] support services." AR at 18154 n.12 (TAB 234) (GAO Decision).  In response to Health Net's argument TriWest's proposal was internally inconsistent, the GAO found "no reason to conclude that changes in ancillary support services . . . would of necessity affect TriWest's technical proposal" because "the technical evaluation contemplated by the solicitation principally focused on network and clinical management, healthcare administration, customer service, and claims processing." *Id.* Ultimately, the GAO determined "[Health Net's] protest ground relie[d] entirely on a questionable chain of inferences . . . [and was] speculative." *Id.*; *see also* AR at 18160 (TAB 234) (GAO Decision) ("[E]ven assuming . . . TriWest's proposal was unclear[,] . . . a lack of clarity does not, of necessity rise to the level of a misrepresentation.").

- TriWest identified the following 12 companies as subcontractors during its corrective action discussions: [XXXXX], [XXXXX], [XXXXX], [XXXXX], [XXXXX], [XXXXX], [XXXXX], [XXXXX], [XXXXX], [XXXXX], [XXXXX], and [XXXXX]. *See* AR Tab 146 at 13957–60 [(noting TriWest's disclosure of its small business subcontractors during corrective action with DHA).]

- TriWest accounted for one company, [XXXXX], by listing its joint venture partner, [XXXXX], during corrective action discussions. *See id.* at 13958 [(noting TriWest's disclosure of its small business subcontractors during corrective action)]; AR Tab 233 at 18055 [(TriWest Comments on Supplemental Agency Report)]

- TriWest identified 15 of the companies as network providers, so they were not subcontractors, per the terms of the solicitation. *See* AR Tab 87 at 5594 ("network providers are not considered subcontractors of the prime Contractor") [(Solicitation requirement to exclude network subcontractors)]; AR Tab 383 at 55149 ("The top urgent care vendors in our Federal Network that have facilities through the T-5 West Region include companies such as [XXXXX]*, [XXXXX]*, [XXXXX]*, [XXXXX]*, [XXXXX]*, and* [XXXXX].  Other examples of national brands that we utilize are [XXXXX] *and* [XXXXX] for laboratory services, and [XXXXX] with 185 hospitals and more than 2,000 sites of care") (emphasis added), 55223 ("TriWest has assessed coverage for in-home [Case Management] visits with [XXXXX], [XXXXX], [XXXXX], [XXXXX], [XXXXX], *and* [XXXXX].") (emphasis added) [(noting TriWest's disclosure of its network providers).]

- TriWest proposed three of the companies, [XXXXX], [XXXXX], and [XXXXX], for contingent future demonstrations, which had no attributable cost for purposes of the small business subcontracting plan. *See* AR Tab 87 at 5541–42 [(Solicitation)]; AR Tab 383 at 55362–83 [(noting TriWest's disclosure of contractors for contingent future demonstrations)]; AR Tab 229 at 17951. [(Declaration of CO Hilary Lewis Attached to Health Net's GAO Briefing stating TriWest proposed [XXXXX] and [XXXXX] for contingent future demonstrate.)]

- The final company, [XXXXX], is a database that TriWest proposed to search to obtain data, so it does not appear to be a "subcontractor" that TriWest is teaming with specifically for the T-5 contract. *See, e.g.*, AR Tab 383 at 55282 ("We will reach out to providers not in our network that are identified by beneficiaries and through provider databases such as [XXXXX] and [XXXXX].") [(TriWest's Initial Proposal discussing Provider Outreach Methods for Recruiting New TRICARE Providers and Strategies for Retaining Existing TRICARE Providers).]

*Id.* at 42–43 (footnote omitted).  The government also clarified TriWest's "list does not include PGBA or TriWest's network subcontractors, which TriWest also identified as subcontractors during corrective action discussions."  *See id.* at 42 n.7.

At oral argument the government explained TriWest initially excluded certain subcontractors from its proposal because certain contractors are "network providers" such that their exclusion was permissible. Tr. at 58:1–8 ("[GOVERNMENT:] [T]he vast majority of these are . . . network providers. I think we've addressed nearly every one of them in our briefing as to why they're . . . either a network provider [or] there was another reason why TriWest didn't need to include that in small business subcontracting plan, such as . . . no attributable cost because it's for future contingent demonstrations."). By way of example, the parties specifically discussed contractor "[XXXXX]," which TriWest alleges it excluded from its subcontractors because the company was proposed for contingent future demonstrations which "had no attributable cost for purposes of the small business subcontracting plan." Gov't's MJAR at 43; Tr. at 62:19–25 ("[GOVERNMENT]: I mean, our understanding for [XXXXX] is that . . . it was proposed as part of contingent future demonstrations . . . and so it didn't have any particularly attributable costs for the purposes of the small business subcontracting claim."). The government explained many of the subcontractors Health Net points to as wrongfully excluded, such as [XXXXX], were listed elsewhere in TriWest's proposal; the contractors were not hidden: "[GOVERNMENT:] It's not like we don't know if [XXXXX] going to perform. I mean, they are . . . listed in TriWest's technical proposal. . . . [T]hat they weren't included on this list here indicates that they're for these contingent future demonstrations." Tr. at 63:16–20.

Plaintiff's arguments about TriWest's dearth of subcontractors and lack of disclosure are centered on TriWest's *initial* proposal. Pl.'s MJAR at 36 ("TriWest's *original* Factor 4 proposal identified only two small businesses . . . [and d]espite not revising any aspects of its proposal aside from its Factor 4 submission, TriWest now purports to rely on at least 34 new small-business subcontractors." (emphasis added)). Plaintiff at oral argument noted this focus: "[PLAINTIFF:] [T]his is not about the specifics of the proposal exclusively, but *the fact that when TriWest was called out* about the changes being made, the explanation being given to the agency goes back to the statement from the T-3 competition and an explanation that these exclusions were done in good faith." Tr. at 94:11–17 (emphasis added). When asked at oral argument to articulate an example of "inaccuracies" in TriWest's subcontracting exclusions, plaintiff struggled and stated: "I don't think we have the data to know what's accurate or inaccurate for these when these are just categories. The point . . . is that TriWest got caught [with inaccuracies as far back as] T-3 because of granularity and examples that made clear to the Government what it was doing." Tr. at 111:20–25; *see also infra* Section VIII (addressing T-3 with respect to plaintiff's past performance under Veterans Affairs (VA) contracts). Plaintiff ultimately overlooks DHA's power to engage in corrective action and review offerors' revised proposals as part of the evaluation process. The Court's review centers on DHA's decision to rate TriWest "Acceptable," considering it undertook corrective action, and the Court must determine whether "the procurement official's decision lacked a rational basis" looking at TriWest's revised proposal. *Garufi*, 238 F.3d at 1332. Here, the CO acknowledged TriWest's initial proposal did not meet Factor 4 requirements in terms of the number of subcontractors, which is why DHA engaged in corrective action in the first place. AR at 14025 (TAB 160) (DHA's Review of TriWest's Revised Proposal); *see supra*. TriWest explained to DHA why it originally excluded certain subcontractors, and TriWest revised its proposal when it understood the subcontractors were improperly excluded. *See* AR 13959–60 (TAB 146) (TriWest EN 01 Discussions); AR at 13987 (TAB 150) (TriWest EN 02 Discussions and Revised Small Business Plan) ("We now realize that our understanding appears to have been mistaken"). During

corrective action, for example, DHA asked TriWest, "What subcontractors does TW propose to utilize to meet its small business subcontracting goals?  I see in TW's proposal that [XXXXX] and [XXXXX] are identified as planned small business subcontractors.  I assume these are not the only small businesses TW has agreements with for T-5."  AR at 13957 (DHA and TriWest EN 01 Discussions).  TriWest responded with a chart containing specific subcontractors it proposed:

**Exhibit EN 6-2: Planned Small Business and AbilityOne Subcontractors**

| Company | Primary Function | SB | SDVOSB | VOSB | SDB | WOSB | HUBZone | AbilityOne |
|---|---|---|---|---|---|---|---|---|
|  | Facilities & | X |  |  | X | X |  |  |

| Company | Primary Function | SB | SDVOSB | VOSB | SDB | WOSB | HUBZone | AbilityOne |
|---|---|---|---|---|---|---|---|---|
|  | Maintenance |  |  |  |  |  |  |  |
|  | Printing & Supplies | X | X | X |  |  |  |  |
|  | Labor (Purchased) | X |  |  | X | X |  |  |
|  | Security & Storage | X |  | X |  |  |  |  |
|  | Capital Asset Purchases, Equipment | X | X | X |  |  | X |  |
|  | Computer Support | X |  |  |  |  |  |  |
|  | Labor (Purchased), Computer Support | X |  |  | X |  |  |  |
|  | Consulting | X | X | X | X |  |  |  |
|  | Other Professional Services | X |  |  |  |  | X |  |
|  | Clinical Support | X |  |  | X |  |  |  |
|  | Printed Matter & Promotional Materials | X |  |  |  |  |  |  |
|  | Computer Support | X | X | X |  |  |  |  |
|  | Labor (Purchased) |  |  |  |  |  |  | X |
|  | Recruiting & Training | X |  |  |  |  |  |  |
|  | Printing & Supplies | X | X | X | X |  | X | X |
|  | Facilities & Maintenance | X |  |  |  |  |  |  |
|  | Recruiting & Training | X |  |  | X | X |  |  |
|  | Computer Support | X |  |  | X | X | X |  |
|  | Computer Support | X |  |  |  |  |  |  |
|  | Labor (Purchased) | X | X | X |  |  |  |  |
|  | Facilities & Maintenance | X |  |  | X |  |  |  |
|  | Consulting | X |  |  |  | X |  |  |
|  | Labor (Purchased) | X | X | X |  |  |  |  |
|  | Postal Handling Fees | X |  |  |  |  |  |  |
|  | Labor (Purchased), Recruiting & Training | X |  |  |  | X |  |  |
|  | Labor (Purchased), Clinical Support | X | X | X |  |  |  |  |
|  | Computer Support | X |  |  |  |  |  |  |
|  | Consulting | X |  |  |  |  |  |  |
|  | Computer Support | X | X | X |  |  |  |  |
|  | Labor (Purchased), Clinical Support | X | X | X | X |  |  |  |
|  | Clinical Support | X | X | X |  | X |  |  |
|  | Computer Support | X | X | X | X |  |  |  |
|  | Printed Matter & Promotional Materials | X | X | X | X |  |  |  |
|  | Clinical Support | X | X | X |  |  |  |  |

**Figure 4**

AR at 13958–59 (TAB 146) (TriWest EN 01 Discussions).

DHA also requested TriWest "provide a list of all anticipated subcontractors (both small and other than small businesses) as well as what function they will perform (which supplies provided, services rendered, etc.) and whether these were excluded from the Small Business subcontracting goals plan under the listed exclusion ('Supplies and services provided by employees, governmental units, government-endorsed monopolies, nonbiddable costs, health care agreements with providers, and network arrangements are excluded') and which of the listed exclusion they were excluded under."  AR at 13959 (DHA and TriWest EN 01 Discussions). TriWest responded:  "TriWest will utilize the small business described in Question 6 and Exhibit EN 6-1 [sic], [*see supra* Figure 4,] and none of these were excluded from the Small Business subcontracting goals plan under the listed exclusion.  In addition to these small businesses, we also plan to use the other than small (large) businesses described in Exhibit EN 6-2":

**Exhibit EN 6-2: Proposed Other Than Small Business Subcontractors**

| Company | Primary Function |
|---|---|
| | Consulting, Other Professional Services, Computer Support |
| Affiliated Network Subcontractors | Other Professional Services |
| | Other Professional Services |
| | Clinical Support |
| | Clinical Support |
| | Computer Support |
| | Computer Support |
| | Clinical Support |
| | Computer Support |
| | Clinical Support, Computer Support |
| | Clinical Support |
| Non-Affiliated Network Subcontractors | Other Professional Services |
| | Clinical Support |
| PGBA, LLC | Claims Processing/Fiscal Intermediary |
| | Computer Support |
| | Training |
| | Other Health Insurance |
| | Computer Support |

**Figure 5**

- 26 -

AR at 13958–59 (DHA and TriWest EN 01 Discussions).  TriWest also noted:  "TriWest does not include health care agreements with providers, consistent with L.5.2.  PGBA, [XXXXX], and [XXXXX] were excluded under the category 'non-biddable costs.'  Affiliated and non-affiliated Network Subcontractors were excluded under the category 'network arrangements' . . . .  TriWest expects to continue to exclude the Affiliated Network Subcontractors . . . ."  AR at 13959 (TAB 146) (TriWest EN 01 Discussions).

In its final assessment, discussed *supra*, the CO stated:  "[a]fter a comprehensive review of the Offeror's subcontracting plan . . . I have assessed the following rating for the Offeror . . . ACCEPTABLE."  AR at 14025 (TAB 160) (DHA's Review of TriWest's Revised Proposal).  Given TriWest's thorough response during corrective action as to its subcontractor composition, plaintiff's argument "there is no reasonable basis to conclude that the 34 additional small businesses will play any role whatsoever in performance," Pl.'s MJAR at 36, lacks merit because the Solicitation only required offerors to submit its "subcontracting plan," AR at 5645 (TAB 87) (Final Amendment to T-5 Solicitation).  TriWest further provided its list of subcontractors during corrective action in response to DHA's request to "provide a list of all anticipated subcontractors (both small and other than small businesses) as well as what function they will perform."  AR at 13959 (TAB 146) (TriWest EN 01 Discussions).  DHA rationally determined TriWest's revised small business subcontracting plan was acceptable by reviewing the updated subcontracting plan and comparing it with the Solicitation requirements—even asking specifically about TriWest only having two small subcontractors during corrective action.  AR at 14025 (TAB 160) (DHA's Review of TriWest's Revised Proposal); AR at 13958–59 (TAB 146) (TriWest EN 01 Discussions).  Here, the Court's assessment *is* "about the specifics of the proposal," not that "TriWest was called out" regarding its initial proposal submission.  Tr. at 94:11–17 (Plaintiff).  DHA's review of TriWest's revised list of subcontractors in accordance with the Solicitation's terms to submit a "subcontracting plan," AR at 5645 (TAB 87) (Final Amendment to T-5 Solicitation), accepting it as credible, and giving it an "Acceptable" rating, was not arbitrary and capricious because "the procurement official's decision [did not] lack[] a rational basis."  *Garufi*, 238 F.3d at 1332; *see Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1331 (Fed. Cir. 2011) ("Where an offeror has certified that it meets the technical requirements of a proposal . . . [t]he proper framing of the acceptability of [a] proposal is . . . [whether the] proposal constitutes 'significant countervailing evidence reasonably known to the agency evaluators that should create doubt whether the offeror will or can comply with the requirement.'" (quoting *In re Spectrum Sys., Inc.*, B-401130, 2009 WL 1325352, at *2 (Comp. Gen. May 13, 2009)).

### 3.    Meaningful Work

Third, plaintiff argues "TriWest did not demonstrate participation (let alone meaningful participation) of small businesses as required by the Solicitation."  Pl.'s MJAR at 37.  Plaintiff explains "[n]owhere in it is initial Factor 4 submission did TriWest state that small businesses would perform meaningful work or even any of the work areas identified in Section C of the Solicitation's Statement of Work."  *Id.*  Plaintiff reasons:  "TriWest did not revise any aspects of its proposal aside from its Factor 4 submission during corrective action to identify or allocate work scope for small businesses[;] [y]et, it purportedly added over a billion dollars in subcontracting spend and 34 new small businesses during corrective action without affecting one

dollar of its cost/price or proposal or its technical approach or requiring additional OCI plan submissions for new entities." *Id.* "Because TriWest did not revise its technical proposal volume and already 'priced in the cost of partnering with subcontractors,' TriWest could not add 34 new small businesses to its proposal without greatly increasing its total subcontracted dollars to account for the new small-business spend, or take away work that had been allocated to other-than-small businesses in the other portions of its proposal." *Id.* at 38. The government responds: "Health Net erroneously argues that the contracting officer's conclusion was irrational based primarily upon issues with TriWest's ***initial*** small business subcontracting plan[:] . . . '[n]owhere in it is initial Factor 4 submission did TriWest state that small businesses would perform meaningful work or even any of the work areas identified in Section C of the Solicitation's Statement of Work.'" Gov't's Cross-MJAR at 38 (quoting Pl.'s MJAR at 37). The government argues "DHA appropriately identified areas of TriWest's small business subcontracting plan that needed to be fixed, and DHA rationally determined that TriWest fixed the issues and submitted an acceptable plan." *Id.*

The Solicitation states the following about subcontractor participation: "[t]he [g]overnment will evaluate the subcontracting plan and *participation of small businesses* on an acceptable/non-acceptable basis." AR at 5645 (TAB 87) (Final Amendment to T-5 Solicitation). There is no requirement for offerors to demonstrate "meaningful" participation as alleged by plaintiff. *See id.*; Pl.'s MJAR at 37. During corrective action, discussed *supra*, TriWest submitted a revised proposal including over 30 small businesses with which it planned to subcontract, identifying work for each of the sub-categories:

**Exhibit 7-14: Planned Small Business and AbilityOne Subcontractors**

| Company | Primary Function | SB | SDB | WOSB | VOSB | SDVOSB | HUBZone | AbilityOne |
|---|---|---|---|---|---|---|---|---|
|  | Facilities & Maintenance | X | X | X |  |  |  |  |
|  | Printing & Supplies | X |  |  | X | X |  |  |
|  | Labor (Purchased) | X | X | X |  |  |  |  |
|  | Security & Storage | X |  |  | X |  |  |  |
|  | Capital Asset Purchases, Equipment | X |  |  | X | X | X |  |
|  | Computer Support | X |  |  |  |  |  |  |
|  | Labor (Purchased), Computer Support | X | X |  |  |  |  |  |
|  | Consulting | X | X |  | X | X |  |  |
|  | Other Professional Services | X |  | X |  |  |  |  |
|  | Clinical Support | X | X |  |  |  |  |  |
|  | Printing & Supplies | X |  |  |  |  |  |  |
|  | Computer Support | X |  |  | X | X |  |  |
|  | Labor (Purchased) |  |  |  |  |  |  | X |
|  | Recruiting & Training | X |  |  |  |  |  |  |
|  | Printing & Supplies | X | X |  | X | X | X | X |

**Figure 6A**

| Company | Primary Function | SB | SDB | WOSB | VOSB | SDVOSB | HUBZone | AbilityOne |
|---|---|---|---|---|---|---|---|---|
| | Recruiting & Training | X | X | X | | | | |
| | Computer Support | X | X | X | | | X | |
| | Computer Support | X | | | | | | |
| | Labor (Purchased) | X | | | X | X | | |
| | Facilities & Maintenance | X | X | | | | | |
| | Consulting | X | | X | | | | |
| | Labor (Purchased) | X | | | X | X | | |
| | Postal Handling Fees | X | | | | | | |
| | Labor (Purchased), Recruiting & Training | X | | X | | | | |
| | Labor (Purchased), Clinical Support | X | | | X | X | | |
| | Computer Support | X | | | | | | |
| | Consulting | X | | | | | | |
| | Computer Support | X | | | X | X | | |
| | Labor (Purchased), Clinical Support | X | X | | X | X | | |
| | Clinical Support | X | | X | X | X | | |
| | Computer Support | X | X | | X | X | | |
| | Printing & Supplies | X | X | | X | X | | |
| | Clinical Support | X | | | X | X | | |

**Figure 6B**

AR at 13997–98 (TAB 150) (TriWest EN 02 Discussions and Revised Small Business Plan). TriWest explained it "identified a number of small businesses with great potential and strong alignment for the establishment of relationships for us to realize our program goals." AR at 13997 (TAB 150) (TriWest EN 02 Discussions and Revised Small Business Plan). TriWest's revised proposal also details various areas of work for subcontracting:

**Exhibit 7-13: Subcontracted Principal Products and Services**

| Product/Service Area | Small Business Concerns | Small Disadvantaged Business Concerns | Women-Owned Small Business Concerns | Veteran-Owned Small Business Concerns | Service-Disabled Veteran-Owned Small Business Concerns | HUBZone Small Business Concerns | AbilityOne | Large Business Concerns |
|---|---|---|---|---|---|---|---|---|
| Claims Processing / Fiscal Intermediary | | | | | | | | X |
| Labor (Purchased) / External Staffing Subcontractors (non-employees) | X | X | X | X | X | | X | |
| Consulting | X | X | X | X | X | | | X |
| Other Professional Services | X | X | X | | | | | X |
| Recruiting & Training | X | X | X | X | X | | | X |
| Facilities & Maintenance | X | X | X | X | X | X | | |
| Security & Storage | X | | X | X | | | | |
| Postal Handling Fees | X | X | | | | | | |
| Printing & Supplies | X | X | X | X | X | X | X | |
| Equipment | X | X | X | X | X | X | | |
| Computer Support | X | X | X | X | X | X | | X |
| Capital Asset Purchases | X | X | X | X | X | X | | |
| Clinical Support | X | X | X | X | X | | | X |

**Figure 6C**

AR 13996 (TAB 150) (TriWest EN 02 Discussions and Revised Small Business Plan); *see supra* Figures 6A, 6B; AR at 13992–93 (TAB 150) (TriWest EN 02 Discussions and Revised Small Business Plan) ("Exhibit 7-13 [Figure 6C] describes the principal types of supplies and/or services to be subcontracted under this contract and the principal types of business planned to be supplying them."). TriWest also specifically noted in its revised proposal: "TriWest will undergo a continuous review during contract performance of all subcontract opportunities throughout the organization to provide maximum practical opportunity and *meaningful work* to small businesses." AR at 13993 (TAB 150) (TriWest EN 02 Discussions and Revised Small Business Plan) (emphasis added). TriWest's revised proposal also stated: "TriWest's purchasing system will include a step to match opportunities with specific Small Business Concerns, Small Disadvantaged Business Concerns (SOB), Women-Owned Small Business Concerns (WOSB), Veteran-Owned Small Business Concerns (VOSB), Service-Disabled Veteran-Owned Small Business Concerns (SDVOSB), HUBZone Small Business Concerns (HUBZone), and AbilityOne (together 'Small Business Concerns') that have the ability to meet quality and performance metrics. This plan will result in *more subcontracts* for many or all of the Small Business Categories." *Id.* (emphasis added).

Demonstrating "participation" was the only requirement set out in the Solicitation: "[t]he [g]overnment will evaluate the subcontracting plan and participation of small businesses on an acceptable/non-acceptable basis." AR at 5645 (TAB 87) (Final Amendment to T-5 Solicitation). TriWest meets this requirement by including extensive detail in its revised plan regarding work for its subcontractors. AR at 13992–93, 13997–98 (TAB 150) (TriWest EN 02 Discussions and

Revised Small Business Plan). Specifically, TriWest was thorough in its explanation of how over 30 small businesses with which it planned to subcontract would perform work within each of various sub-categories. *Id.* TriWest included two detailed Exhibits—reproduced in Figures 6A–6C *supra*—identifying subcontractors and the type of work to be performed by its subcontractors. *See supra* Figures 6A–6C. For example, Figures 6A–6C show small businesses will perform in Facilities & Maintenance, Printing & Supplies, Labor (Purchased), Security and Storage, Capital Asset Purchases, Equipment, Computer Support, Consulting, Professional Services, Clinical Support, Recruiting & Training, and Postal Handling Fees. *Id.* Figure 6A–6B explain specifically some small business subcontractors will perform in these categories. *See supra* Figure 6A–6B. TriWest's revised proposal also specifically noted it would "undergo a continuous review during contract performance of all subcontract opportunities throughout the organization to provide maximum practical opportunity and meaningful work to small businesses." AR at 13993 (TAB 150) (TriWest EN 02 Discussions and Revised Small Business Plan). While "TriWest did not revise any aspects of its proposal aside from its Factor 4 submission during corrective action to identify or allocate work scope for small businesses," Pl.'s MJAR at 37, TriWest was not required to alter other areas of its proposal during corrective action—only Factor 4, *see* AR at 14023–25 (DHA's Review of TriWest's Revised Proposal). TriWest's proposal goes beyond demonstrating how its subcontractors will merely "participat[e]." AR at 5645 (TAB 87) (Final Amendment to T-5 Solicitation). It explained the work opportunities available to small business subcontractors and explained which small business subcontractors would be performing what work. AR at 13992–93, 13997–98 (TAB 150) (TriWest EN 02 Discussions and Revised Small Business Plan). TriWest dedicated a significant portion of its revised proposal to demonstrating work opportunities for small business subcontractors—approximately six pages of its 16-page revised proposal. AR at 13992–98 (TAB 150) (TriWest EN 02 Discussions and Revised Small Business Plan). The CO deemed the revised Factor 4 plan to be acceptable in light of TriWest's explanation of how its subcontractors will "participat[e]": "[a]fter a comprehensive review of the Offeror's subcontracting plan . . . as well as *the Offeror's plan to maximize small business participation* under the resultant award, I have assessed the following rating for the Offeror: . . . ACCEPTABLE." AR at 14025 (TAB 160) (DHA's Review of TriWest's Revised Proposal) (emphasis added). As such, DHA's review of TriWest's revised proposal, including TriWest's subcontractor participation work goals, was not arbitrary and capricious because "the procurement official's decision [did not] lack[] a rational basis," given the thorough review during corrective action. *Garufi*, 238 F.3d at 1332.

### 4.    Good Faith Efforts

Fourth, plaintiff argues "TriWest failed to demonstrate good faith efforts or plans to meet the Solicitation's subcontracting goals to the maximum extent practicable." Pl.'s MJAR at 38. Plaintiff states: "[e]ven under a deferential standard of review, DHA's conclusion that TriWest's revised Factor 4 proposal 'clearly meets the minimum requirements of the solicitation' cannot withstand scrutiny." *Id.* at 38–39 (emphasis omitted) (quoting AR at 5645 (TAB 87) (Final Amendment to T-5 Solicitation)). Plaintiff argues: "[n]othing in TriWest's proposal or its performance to date suggests that TriWest is undertaking good faith efforts or maximizing small business spend." *Id.* at 39. Plaintiff explains: "at every step of the way TriWest has attempted to impermissibly carve out hundreds of millions of dollars from its overall subcontracting spend

and reduce its reliance on small business subcontracting to maintain its existing or convenient other-than-small business relationships." *Id.* at 39 (first citing AR TAB 146 (TriWest EN 01 Discussions); and then citing AR TAB 150 (TriWest EN 02 Discussions and Revised Small Business Plan)). Plaintiff reasoned: "TriWest is doing everything it can to avoid including costs in its small business subcontracting calculations. This is the antithesis of 'good faith.'" *Id.* The government responds "[t]he contracting officer rationally concluded that TriWest's small business subcontracting plan was submitted in good faith based upon its identification of specific small business concerns in every required subcategory and its management commitments toward small business." Gov't Cross-MJAR at 37. The government argues "Health Net erroneously argues that the contracting officer's conclusion was irrational based primarily upon issues with TriWest's initial small business subcontracting plan" because the initial plan "is irrelevant to the rationality of the contracting officer's determination that TriWest's revised small business subcontracting plan demonstrated good faith plans to meet the small business goals identified in the solicitation to the maximum extent practicable." *Id.* at 38 (emphasis omitted). The government asserts "Health Net has failed to demonstrate that DHA irrationally determined that TriWest's revised small business subcontracting plan demonstrated good faith plans to meet the solicitation's goals to the maximum extent practicable." *Id.* at 39.

The Solicitation states "[t]he [g]overnment will assess the extent the Offeror identifies businesses in the Plan and *demonstrated good faith efforts* or plans to meet the below goals using . . . small business subcontractors." AR at 5645 (TAB 87) (Final Amendment to T-5 Solicitation) (emphasis added). TriWest disclosed the make-up of its initial proposal throughout corrective action and submitted a new revised proposal meeting the Solicitation's standards under Factor 4. *See* AR TAB 146 (TriWest EN 01 Discussions); AR TAB 150 (TriWest EN 02 Discussions and Revised Small Business Plan); AR at 14025 (DHA Final Assessment of TriWest's Revised Proposal) ("[a]fter a comprehensive review of the Offeror's subcontracting plan . . . I have assessed the following rating for the Offeror: . . . ACCEPTABLE."). Much of plaintiff's argument surrounds TriWest's initial proposal not meeting Factor 4 requirements and therefore argues TriWest submitted its proposal not in good faith. *See, e.g.*, Pl.'s MJAR 37–39 (citing AR at 7331–48 (TAB 102) (TriWest Proposal)). The Court, however, reviews DHA's decision to rate TriWest's proposal acceptable in light of corrective action; the Court does not consider 'TriWest's initial proposal alone in determining whether "the procurement official's decision lacked a rational basis." *Garufi*, 238 F.3d at 1332. DHA need only assess "the extent the Offeror . . . demonstrated good faith efforts or plans to meet the . . . goals using small business." AR at 5645 (TAB 87) (Final Amendment to T-5 Solicitation). In TriWest's revised proposal, it included a section dedicated to "Good-Faith Efforts and Plans" to meet the Solicitation's subcontracting goals to the maximum extent practicable as required by the Solicitation:

### Good-Faith Efforts and Plans

TriWest has historically and will continue, whenever practicable, to solicit bids for all purchases, making certain that Small Business Concerns have a chance to compete. TriWest also maintains and continually updates a source list of Small Business Concerns to expand opportunities for these businesses to compete for subcontracts.

TriWest continues to incorporate a diverse business mix in our vendor and supplier base, as well as to maximize the use of Small Business Concerns in our business model, in order to assist the Department of Defense in accomplishing its goal of expanding opportunities for this segment of the business community. This diverse mix of small business concerns includes, VOSBs, SDVOSBs, HUBZone, SDB, WOSB, and AbilityOne, and, when possible, tribal, Native Hawaiian, and Alaska Native Corporations (ANC). *These relationships support our company's good faith efforts and plans to meet our T-5 proposed goals related to utilization of Small Business Concerns.*

. . . TriWest has provided a listing of small businesses with whom TriWest currently plans to use during T-5. *TriWest will also make good faith efforts to acquire articles, equipment, supplies, services, or materials from small businesses* that we used in preparing the proposal in the same or greater scope, amount, and quality used in preparing the proposal, and will provide written explanation to the contracting officer if we fail to do so.

AR at 13997 (TAB 150) (TriWest EN 02 Discussions and Revised Small Business Plan) (emphasis added). DHA reviewed this section dedicated to "Good-Faith Efforts and Plans" in its assessment of TriWest's revised proposal and deemed the revised proposal to meet the Solicitation's needs:

I note that TriWest's proposal cites specific small business concerns in every required subcategory in its Exhibit 7-14: Planned Small Business and AbilityOne Subcontractors . . . and that this indicates TriWest's proposal is credible and submitted in *good faith*. In addition, TriWest's proposal includes its stated policy management commitments toward small business on pages 51 and 53, which also supports my determination that the revised proposal is credible and submitted in *good faith*.

AR at 14025 (TAB 160) (DHA Final Assessment of TriWest's Revised Proposal) (emphasis added). Despite TriWest's detailed proposal and subcontracting goal discussion, plaintiff argues "TriWest failed to demonstrate good faith efforts or plans to meet the Solicitation's subcontracting goals to the maximum extent practicable." Pl.'s MJAR at 38. The Solicitation, however, merely stated "[t]he [g]overnment will assess the extent the Offeror . . . demonstrated good faith efforts or plans to meet the . . . goals using small business." AR at 5645 (TAB 87) (Final Amendment to T-5 Solicitation) (emphasis added). TriWest need only "demonstrate[] good faith efforts or plans to meet the . . . goals using small business" and its proposal provides detail as to how TriWest will meet the small business goal, specifically within the Good-Faith Efforts and Plans section. *See* AR at 13997–98 (TAB 150) (TriWest EN 02 Discussions and Revised Small Business Plan); AR at 5645 (TAB 87) (Final Amendment to T-5 Solicitation). DHA's review of TriWest's revised proposal, including TriWest's good faith efforts to meet the subcontracting plan, was not arbitrary and capricious because "the procurement official's decision [did not] lack[] a rational basis," given DHA's assessment and consideration of this plan during corrective action. *Garufi*, 238 F.3d at 1332.

**B.     Whether TriWest Materially Misrepresented the Total Estimated Value of Its Planned T-5 Subcontracting Spending and Subcontracting Commitments**

Plaintiff's material misrepresentation argument mirrors its argument DHA erroneously evaluated TriWest's proposal because the "common core" of facts is identical but the "remedy is unique" for material misrepresentation, calling for disqualification of TriWest.  Tr. at 130:1–7 ("[THE COURT:]  [W]hat's unique about what's materially misrepresented?  [PLAINTIFF]:  . . . [O]ur opening brief consolidated the facts for both evaluation errors as well as material misrepresentation errors.  So there is a common core there . . . ."); Tr. at 129:21–24 ("THE COURT:  . . . What's unique about the material misrepresentation argument?  [PLAINTIFF]: [What is] unique in particular, Your Honor, would be on the remedy and the consequences."). Plaintiff argues "TriWest materially misrepresented its subcontracting spending calculations and commitments, premising its proposal and subcontracting calculations on exclusions that were plainly impermissible, resulting in TriWest unlawfully excluding billions of dollars in subcontracting spending from its proposal."  Am. Compl. at 71 (Count I).  Plaintiff asserts in TriWest's initial proposal:  "TriWest did not state that it excluded all or any of the $[XXXXX] billion subcontract to PGBA, nor did it identify the dollar amounts for any category of its $[XXXXX] billion total in outright exclusions from its identified 'Subcontract Opportunities'" and "TriWest's statement that there was only $[XXXXX] available for subcontracting was false."  *Id.* at 72.  According to plaintiff, TriWest "introduced further misrepresentations in its revised proposal, including the improper exclusion of 'Employee Costs,' 'Network Subcontractors,' and numerous other-than-small subcontractors."  *Id.* at 72.  Plaintiff argues "TriWest submitted its proposal with known impermissible exclusions, known overstated subcontracting goal achievements, and known lack of good faith and received award from DHA . . . [which] is a misrepresentation."  Pl.'s MJAR at 48.  Plaintiff also argues TriWest engaged in an *intentional* misrepresentation because "TriWest knew it was previously instructed by a DHA Contracting Officer not to rely on any such exclusions."  *Id.*

At oral argument plaintiff struggled to articulate examples of misrepresentations in TriWest's proposal.  *See* Tr. at 133:7–23.  Specifically, plaintiff tried to point to the following portions of TriWest's proposal being false:  (1) TriWest's affiliates having "control"; (2) "TriWest's assertion that they have meaningful work subcontracted to small businesses"; and (3) TriWest's "the inclusion of [certain affiliate] entities" in its proposal.  *Id.* ("THE COURT:  I'm just asking for one misrepresentation . . . .  [PLAINTIFF]: . . . [T]he fact that these are affiliates is one example.  They are not.  They don't control. . . .  [Also,] TriWest's assertion that they have meaningful work subcontracted to small businesses with half of the identified small businesses supporting a specific statement of work in Section C, and the inclusion of the entities.").

Plaintiff's examples are not misrepresentations because they are not "false," but rather exclusions TriWest disclosed during corrective action.  *Blue & Gold Fleet, LP v. United States*, 70 Fed. Cl. 487, 495 (Fed. Cl. 2006) ("To establish a material misrepresentation, plaintiff must demonstrate that (1) [the awardee] made a false statement; and (2) the [agency] relied on that false statement in selecting [the] proposal for the contract award."), *aff'd*, 492 F.3d 1308 (Fed. Cir); *see* AR TAB 146 (TriWest EN 01 Discussions); AR TAB 150 (TriWest EN 02 Discussions and Revised Small Business Plan).  DHA asked TriWest about excluding affiliates during

corrective action and TriWest explained (1) why its affiliates have control and (2) why they are properly excluded, as discussed *supra* Section V.A.2.  AR at 13985–86 (TAB 150) (TriWest EN 02 Discussions and Revised Small Business Plan) ("[T]he TriWest shareholder entities should be considered 'affiliates' within the FAR 2.101 definition and their planned work as Network Subcontractors may be excluded from subcontractor status within the Small Business Subcontracting Plan.  The shareholder entities 'control' TriWest by virtue of their legal relationships to TriWest.").  Plaintiff's MJAR clarifies its meaningful work argument relates to TriWest's *initial* proposal and subsequent failure to amend its proposal during corrective action: "Nowhere in it is *initial* Factor 4 submission did TriWest state that small businesses would perform meaningful work or even any of the work areas identified in Section C of the Solicitation's Statement of Work.  TriWest did not revise any aspects of its proposal aside from its Factor 4 submission . . . ."  Pl.'s MJAR at 37 (emphasis added) (citing AR at 7331–48 (TAB 102) (TriWest Proposal)).

TriWest, however, submitted a *revised* proposal as a result of corrective action, AR at 13989–14004 (TAB 150) (TriWest EN 02 Discussions and Revised Small Business Plan), which did identify over 30 small businesses for subcontracting and their corresponding category of participation.  *See supra* Section V.A.2; Figures 6A–6C; AR at 13997–98 (TAB 150) (TriWest EN 02 Discussions and Revised Small Business Plan) ("TriWest has identified a number of small businesses with great potential and strong alignment for the establishment of relationships for us to realize our program goals.").  TriWest also identified various areas of work for subcontracting. AR at 13992–93 (TAB 150) (TriWest EN 02 Discussions and Revised Small Business Plan) ("Exhibit 7-13 describes the principal types of supplies and/or services to be subcontracted under this contract and the principal types of business planned to be supplying them."); Figure 6C. TriWest also specifically noted in its revised proposal:  "TriWest will undergo a continuous review during contract performance of all subcontract opportunities throughout the organization to provide maximum practical opportunity and *meaningful work* to small businesses."  AR at 13993 (TAB 150) (TriWest EN 02 Discussions and Revised Small Business Plan) (emphasis added).  Plaintiff has not demonstrated TriWest made a "false statement" in its proposal, *see* Tr. at 133:7–134:2, because TriWest explained its relationship with its affiliates, how the affiliates have control, and how its subcontractors will complete work under its revised proposal.  These disclosures do not constitute falsities sufficient to establish material misrepresentation.  *Blue & Gold Fleet, LP*, 70 Fed. Cl. at 495, *aff'd*, 492 F.3d 1308 ("To establish a material misrepresentation, plaintiff[s] must demonstrate that (1) [the awardee] made a false statement; and (2) the [agency] relied on that false statement in selecting [the] proposal for the contract award."); *see also Glob. K9 Prot. Grp., LLC v. United States*, 2023 WL 8940893, at *16–17 (Fed. Cl. Dec. 22, 2023) (first citing *Blue & Gold Fleet, LP*, 70 Fed. Cl. 487; and then citing *Plan. Rsch. Corp. v. United States*, 971 F.3d 736, 741 (Fed. Cir. 1992)).  Accordingly, TriWest did not make material misrepresentations in its proposal and plaintiff's argument fails.  *Blue & Gold Fleet, LP*, 70 Fed. Cl. at 495, *aff'd*, 492 F.3d 1308; *Glob. K9*, 2023 WL 8940893, at *16–17 (first citing *Blue & Gold*, 70 Fed. Cl. 487; and then citing *Plan. Rsch. Corp. v. United States*, 971 F.2d, 736, 741 (Fed. Cir. 1992)).

VI.     **Whether DHA Arbitrarily and Capriciously Failed to Ask Questions or Request Additional Documentation Surrounding Plaintiff's Alleged Inconsistencies Within TriWest's Proposal**

A.      **TriWest's Affiliates and Control**

Plaintiff asserts the agency's review of TriWest's proposal was arbitrary and capricious, in part, because the agency improperly allowed TriWest to exclude various subcontractors from its small business subcontracting plan and did not ask additional questions regarding the exclusion. *See supra* Section III.C.  At oral argument, the government addressed its reasons for excluding $[XXXXX] million for Affiliated Network Subcontractors from its calculation of Total Included Subcontractors:  "THE COURT: . . . [W]hy should the [XXXXX] million be out of the denominator?  [GOVERNMENT]:  Well, because the agency rationally determined that . . . the shareholders are affiliates of TriWest, and there's no dispute . . . between the parties here that affiliates can be removed from the denominator."  Tr. at 11:18–24.  Plaintiff argues the $[XXXXX] million should be added to its Total Included Subcontractors:  "[THE COURT:] Plaintiff's argument is the [XXXXX] million should be added to the denominator. [PLAINTIFF]:  Correct, Your Honor."  Tr. at 10:20–22.  If TriWest was required to add $[XXXXX] million to its subcontracting denominator, its subcontracting goal would therefore fall below the 25 percent goal set in the Solicitation.

Whether TriWest's shareholders are "affiliates" ultimately controls whether TriWest's proposal apportioned 25 percent of subcontracts for small businesses, consistent with the Solicitation's goal.  *See supra* Section V.A.  FAR 2.101 defines "affiliates" as "business concerns" who have "control."  FAR 2.101 (2023) ("Affiliates means associated *business concerns* or individuals if, directly or indirectly either *one controls or can control* the other; or third party controls or can control both . . . ." (emphasis added)).  This definition applies to the whole of the FAR.  FAR 19.001—which applies only to FAR Part 19—defines a "concern" as "any business entity organized *for profit* . . . that makes a significant contribution to the U.S. economy."  FAR 19.001 (2023) (emphasis added).  If DHA correctly applied FAR 2.101 and determined TriWest's shareholders are "business concerns" with "control," then the agency rationally permitted TriWest to exclude shareholders its overall subcontracting costs.  If, on the other hand, FAR 19.001 requires the "business concerns" of FAR 2.101 to only be "for profit," the agency incorrectly permitted TriWest to exclude the shareholders.  The Court therefore first addresses whether the agency rationally determined TriWest's shareholders were "business concerns" and then determines whether the shareholders had control.

1.      **Business Concerns**

The Court first addresses the "business concerns" portion of the FAR 2.101 definition. At oral argument, plaintiff agreed FAR 2.101 is relevant in determining the correct definition of "affiliate."  Tr. at 17:21–25.  Plaintiff argued, however, the definition of "concern" in FAR 19.001 should limit the definition of "affiliate" because the contract here "com[es] under a FAR 19 . . . analysis":  "[PLAINTIFF:]  [A]ll of this is coming under a FAR 19.7 analysis.  So if [the government] is trying to make a statement that [FAR 19] might not apply globally in all contexts, it's disregarding the fact that this is of a subcontracting plan under FAR Part 19."  Tr. at 67:14–19.  The government contends FAR 2.101 alone is controlling in defining "business concern" because "the definition in FAR 19.001 expressly says 'as used in this part,' and [FAR] 2.101 is not in FAR Part 19."  Tr. at 68:2–7.

The contract here is a procurement governed by FAR Part 15. AR at 5623 (TAB 87) (Final Amendment to T-5 Solicitation) ("This is a best value source selection conducted in accordance with Federal Acquisition Regulation (FAR) *Part 15.3*, Source Selection, as supplemented by the Defense Federal Acquisition Regulation Supplement (DFARS)." (emphasis added)). Plaintiff argues the definition of "concern" from FAR 19.001 should apply nonetheless. Pl.'s Reply at 17. The scope of FAR Part 19, described in FAR 19.000, states: "Offerors that participate in *any procurement under this part* are required to meet the definition of 'small business concern' at 2.101 and the definition of 'concern' at 19.001." FAR 19.000 (2023) (Scope of part). FAR 19.001 states: "*As used in this part- Concern* means any business entity organized for profit (even if its ownership is in the hands of a nonprofit entity) . . . . 'Concern' includes but is not limited to an individual, partnership, corporation, joint venture, association, or cooperative." FAR 19.001 (2023) (emphasis added).

DHA clarified it applied FAR 2.101 to define "affiliate" in corrective action: "DHA has determined the definition of 'Affiliate' in *FAR 2.101 is more appropriate* than the definition at FAR 52.219-9(1) to define the entities that may be excluded from subcontractor status within an offeror's Small Business Subcontracting Plan." AR at 13985 (TAB 150) (TriWest EN 02 Discussions and Revised Small Business Plan) (emphasis added). The Solicitation includes the following language related to FAR Part 19, discussing the subcontracting plan requirements:

> Offerors designated as large businesses shall include in Volume I a subcontracting plan as required by FAR 19.702, FAR 19.704, FAR 52.219-8 Utilization of Small Business Concerns, FAR 52.219-9 Small Business Subcontracting Plan, and DFARS 252.219-7003, Small Business Subcontracting Plan (DoD Contracts), Alt I. Please note that network providers are not considered subcontractors of the prime Contractor, and therefore health care services provided by network providers may not be counted in the subcontract plan. Additionally, Offerors are advised that Contractors may use the services and/or products of qualified nonprofit agencies for the blind or other severely handicapped to count toward meeting the subcontracting goal (see 10 U.S.C. Section 2410d ). The following 13 elements of FAR 19.704 are required to be included in Offeror's subcontracting plan . . . ."

AR at 5594 (TAB 87) (Final Amendment to T-5 Solicitation).

The agency's Solicitation resolves any ambiguity in the applicability of FAR 19 and FAR 2.101. In the paragraph *supra*, DHA only cited FAR 19.702 and FAR 19.704, rather than citing all of FAR Part 19 or FAR 19.001 specifically. *Id.* As the contract itself is a procurement governed by FAR Part 15 (rather than FAR Part 19), the Solicitation therefore did not adopt all provisions of FAR 19. *See id.* Instead, DHA selectively adopted FAR 19.702 and FAR 19.704 for its subcontracting plan requirements. *See id.* DHA's Solicitation did not require offerors to adopt every provision of FAR Part 19, including FAR 19.001's requirement for "concerns" to be "for profit." FAR 19.0001. The agency clarified this approach in corrective action when it instructed TriWest to apply the definition of "Affiliate" from FAR 2.101 rather than FAR

52.219-9, which governs "Small Business Subcontracting Plan[s]."[13]  AR at 13985 (TAB 150) (TriWest EN 02 Discussions and Revised Small Business Plan) ("[T]he definition of 'Affiliate' in FAR 2.101 is more appropriate than the definition at FAR 52.219-9(1).").  Furthermore, DHA was the first to use the term "Affiliates" when the agency inquired during corrective action whether TriWest's subcontracting plan excluded "Affiliates."  *See* AR at 13955 (TAB 146) (TriWest EN 01 Discussions); Tr. at 15:9–13, 16:5–15, 10:23–11:10.  During corrective action, the agency did not instruct TriWest to apply the definition of "concerns" from FAR 19.001, and it did not instruct TriWest to apply the definition of "small business concerns" from FAR 2.101; it only required "Affiliate" from 2.101.  *See* AR at 13985 (TAB 150) (TriWest EN 02 Discussions and Revised Small Business Plan).  The agency therefore properly instructed TriWest to apply the definition of "Affiliate" from FAR 2.101.  *Garufi*, 238 F.3d at 1333 ("[A] bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" (quoting *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

Under FAR 2.101, "Affiliate" is defined as "associated business concerns."  FAR 2.101. No other applicable FAR provision requires the exclusion of nonprofit shareholders from the definition of "business concerns."  The Court therefore finds TriWest's nonprofit shareholders are business concerns within the definition of "Affiliate" for FAR 2.101, and the agency did not improperly rely on TriWest's corresponding assertions.  *Garufi*, 238 F.3d at 1333.

### 2.    Control

The Court next addresses the "control" portion of the FAR 2.101 definition.  The agency asked TriWest about the issue of control during corrective action, stating:

> DHA has determined the definition of "Affiliate" in FAR 2.101 is more appropriate than the definition at FAR 52.219-9(1) to define the entities that may be excluded from subcontractor status within an offeror's Small Business Subcontracting Plan. Does TW assert that its Network Subcontractors, which are shareholder entities, are "affiliates" within the FAR 2.101 definition?  If so, please provide additional information or documentation supporting TW's statement that "the shareholders are therefore directly represented and deemed directors of the corporation under the Delaware law."

AR at 13985–86 (TAB 150) (TriWest EN 02 Discussions and Revised Small Business Plan). TriWest responded:

> Yes, the TriWest shareholder entities should be considered "affiliates" within the FAR 2.101 definition and their planned work as Network Subcontractors may be

---

[13] During the first round of corrective action, the agency asked TriWest whether "any of [its] subcontracting plan's excluded categories 'affiliates' as defined in FAR 52.219-9(*l*)."  AR at 13955 (TAB 146) (TriWest EN 01 Discussions).  FAR 52.219-9(*l*), however, does not provide a definition for "affiliates."  Rather, the provision only discusses affiliates in context:  "Purchases from a corporation, company, or subdivision that is an *affiliate* of the Contractor or subcontractor are not included in these reports.  Subcontract awards by *affiliates* shall be treated as subcontract awards by the Contractor."  FAR 52.219-9(*l*) (emphasis added).  Perhaps recognizing this discrepancy, the agency instructed TriWest during the second round of corrective action FAR 2.101's definition of "Affiliate" was "more appropriate."  AR at 13985 (TAB 150) (DHA and TriWest Corrective Action EN 02 Discussions).

excluded from subcontractor status within the Small Business Subcontracting Plan. The shareholder entities "control" TriWest by virtue of their legal relationships to TriWest [under Delaware law].

*Id.* TriWest specifically cited title 8, section 351 of the Delaware Code, which provides: "The certificate of incorporation of a close corporation may provide that the business of the corporation shall be managed by the stockholders of the corporation rather than by a board of directors." DEL. CODE ANN. tit. 8, § 351 (2023). TriWest also provided an excerpt from its Articles of Incorporation to show its shareholders act as the board of directors. AR at 13986–87 (TAB 150) (TriWest EN 02 Discussions and Revised Small Business Plan).

The government at oral argument did not dispute how DHA applied section 351 to FAR 2.101 to define affiliates. *See* Tr. at 77:12–17 ("THE COURT: . . . [S]o Delaware section 351[,] 'shall be managed by the stockholders of the corporation[,]' this management here is sufficient to meet the requirements for control under 'Affiliation' under FAR 2.101? [GOVERENMENT]: Yes."). Plaintiff cited *Emerald Partners v. Berlin* at oral argument, quoting footnote 8, which states: "Although a shareholder who owns less than 50% of a corporation's outstanding stock, without some additional allegation of domination through actual control of corporation conduct, is not a 'controlling stockholder' . . . ." *Emerald Partners v. Berlin*, 726 A.2d 1215, 1221 n.8 (Del. 1999); Tr. at 78:8–12. The government noted TriWest is a close corporation and argued caselaw for traditional corporate structures, such as *Emerald*, does not apply to close corporations. *See* Tr. at 79:15–22 ("[GOVERNMENT]: I think that's the problem of trying to apply *Emerald Partners*, a case involving a traditional corporation, to a situation involving a close corporation . . . . THE COURT: . . . The distinction here is that [*Emerald* does] . . . not [involve] a close corporation, so it operates differently. [GOVERNMENT]: Right."). The government argues plaintiff's cited Delaware caselaw does not alter the law related to closely held corporations. *See id.* Plaintiff ultimately conceded it did not cite to any cases applying to close corporations in its brief: "THE COURT: [Plaintiff], do you have a close corporation case that would apply directly? [PLAINTIFF]: Your Honor, . . . I don't have a close corporation case . . . ." Tr. at 80:8–11; *see Emerald*, 726 A.2d 1215. Plaintiff, however, cited to an additional Delaware statute—title 8, section 356 of the Delaware Code—during oral argument in an attempt to demonstrate the applicability of general corporate laws to close corporations. *See* Tr. at 83:21–84:4. Section 356 states "[t]his subchapter shall not be deemed to repeal any statute or rule of law which is or would be applicable to any corporation which is organized under this chapter *but is not a close corporation*." DEL. CODE ANN. tit. 8, § 356 (emphasis added). This statute does not change the effect of section 351, which does, in fact, apply to close corporations. Tr. at 84:15–19 ("THE COURT: But what [section 356] says is it doesn't destroy any other law by noting a requirement or an allowance for a close corporation. It doesn't say that all other requirements appl[y] to close corporations just the same . . . ."). Plaintiff later conceded at oral argument the lack of applicability of section 356 to close corporations: "[THE COURT]: But that's not what the statute[, section 356,] that you just read says. [PLAINTIFF]: It doesn't address exactly that point, Your Honor." Tr. at 85:13–16.

The government agreed there was no caselaw or GAO decision where a court referenced state law to interpret the FAR, as in this case. Tr. at 82:20–24 ("THE COURT: Is the Government aware of any situation where a CO has relied on state corporate governance law in

order to understand these requirements being met?  [GOVERNMENT]:  No, I'm not aware of one.").  The FAR does not include a definition of "control" under FAR 2.101.  *See* FAR 2.101; Tr. at 68:22–25 ("[THE COURT:]  Does the FAR describe what 'control' means at all? [GOVERNMENT]:  . . . [N]ot that I can recall).  Both parties agreed, however, DHA was permitted to look to Delaware law in determining whether TriWest shareholders had control and whether they met the definition of affiliates.  Tr. at 19:1–5 ("THE COURT:  So it's fair to look to Delaware corporate law?  [PLAINTIFF]:  Yes, Your Honor. . . .  [GOVERNMENT]:  Yes, Your Honor.").  The appropriateness of applying Delaware law is therefore not at issue; the Court need not decide whether application of state law is appropriate and instead determines only whether the agency's interpretation of the law as it relates to TriWest's proposal was arbitrary and capricious.

Plaintiff presents a weak argument when it states, "DHA was required to ask further questions [about control] before making award."  *See* Pl.'s MJAR at 26, 30.  DHA asked TriWest about its shareholders being affiliates during corrective action and received a sufficient answer from TriWest.  AR at 13985–86 (TAB 150) (TriWest EN 02 Discussions and Revised Small Business Plan) ("Does TW assert that its Network Subcontractors, which are shareholder entities, are "affiliates" within the FAR 2.101 definition?  If so, please provide additional information or documentation supporting TW's statement that 'the shareholders are therefore directly represented and deemed directors of the corporation under the Delaware law.'").  Specifically, TriWest explained its shareholders are affiliates according to title 8, section 351 of the Delaware Code:  "TriWest shareholder entities should be considered 'affiliates' within the FAR 2.101 definition and their planned work as Network Subcontractors may be excluded from subcontractor status within the Small Business Subcontracting Plan.  The shareholder entities 'control' TriWest by virtue of their legal relationships to TriWest," specifically section 351.  *Id.* At oral argument the government stated:  "[DHA] certainly could have asked for more information from TriWest . . . but there was no need to here.  We have . . . the relevant information right here in TriWest's response."  Tr. at 87:1–5.  The language of title 8, section 351 of the Delaware code sufficiently answers the question of control in this case because TriWest is (1) a close corporation and (2) TriWest's shareholders control pursuant to its certificate of incorporation.  *See* Del. Code Ann. tit. 8, § 351 ("The certificate of incorporation of a close corporation may provide that the business of the corporation shall be managed by the stockholders of the corporation rather than by a board of directors.").  Further, it was not arbitrary and capricious for DHA to use FAR 2.101 alone to define what a business concern is because FAR 2.101 provides an applicable definition for affiliates generally.  *See supra* Section VI.A.1.  The term "Affiliates" only first arose in corrective action discussions with TriWest, and DHA chose to define "Affiliate" using FAR 2.101.  *See* Tr. at 15:9–13; Tr. at 16:5–15; Tr. at 10:23–11:3.

Plaintiff also argues DHA failed to review TriWest's corporate documents in determining whether its shareholders are affiliates and asserted TriWest's Strategic Alliance Agreement and corporate bylaws override TriWest's articles of incorporation and statutes.  Tr. at 90:10–13 ("[PLAINTIFF:]  The agency didn't review the underlying corporate documentation [including the strategic alliance agreement], other than an excerpt that was provided by TriWest in response to discussions questions.").  The government disagreed.  Tr. at 90:16–25 ("[GOVERNMENT:] Just in response to that, I mean, what assumptions did the agency make about the Health Net

- 40 -

agreement or the strategic alliance agreements?  I don't see any there in the record that I'm aware of.  The agency relied on the Delaware statute that TriWest cited, as well as the excerpt of the articles of incorporation that TriWest had cited, not whatever may or may not be in Health Net agreements or bylaws that should not be able to override articles of incorporation.").  TriWest submitted an excerpt from its Articles of Incorporation during corrective action.  AR at 13986–87 (TAB 150) (TriWest EN 02 Discussions and Revised Small Business Plan).  The excerpt stated:

> The business and affairs of the Corporation shall be managed by or under the direction of the stockholders of the Corporation rather than by a board of directors.  Each of the stockholders shall designate one or more persons who are authorized to act on behalf of such stockholder with respect to such stockholder's rights to participate in the management and direction of the business and affairs of the Corporation.

*Id.*  This provision aligns with the government's and TriWest's contention its shareholders control TriWest.  Plaintiffs do not present any evidence showing the shareholders do not manage "[t]he business and affairs of the Corporation" and "participate in the management and direction of the business and affairs of the Corporation."  It was reasonable for DHA to rely on these provisions to determine the company had control.  *Garufi*, 238 F.3d at 1333 ("[T]he contracting agency provided a coherent and reasonable explanation of its exercise of discretion . . . ." (quoting *Latecoere Int'l Inc. v. U.S. Dep't of the Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)).  A contracting officer is generally "entitled to rely on a contractor's certifications" and has no obligation to undertake a fishing expedition to find documents disproving TriWest's assertion.  *See Harmonia*, 999 F.3d at 1405–06.  The excerpt provided presented no reasonable indication the shareholders did not have control under Delaware law.  *See Garufi*, 238 F.3d at 1333 ("[A] bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" (quoting *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

TriWest's non-profit shareholders are accordingly "business concerns" under the FAR 2.101 definition and these business concerns control TriWest under both title 8, section 351 of the Delaware Code and TriWest's articles of incorporation.  DHA inquired appropriately into TriWest's affiliates, AR at 13985–86 (TAB 150) (TriWest EN 02 Discussions and Revised Small Business Plan), and made a rational decision using FAR 2.101 and section 351.  As such, "the procurement official's decision [did not] lack[] a rational basis."  *Garufi*, 238 F.3d at 1332.

## B.    TriWest's Subcontracting Plan

Plaintiff, second, argues DHA's award was arbitrary and capricious as a result of "DHA's failure to 'fully investigate' before award" various aspects of TriWest's subcontracting plan.  Pl.'s MJAR at 31.  Specifically, plaintiff argues DHA "failed" to ask about:

- "How TriWest added 34 small businesses and billions in subcontracting spending[: $[XXXXX]]."  *Id.* at 24, 26 (emphasis omitted);
- "TriWest's largest exclusion—a $[XXXXX] billion exclusion for nondescript 'Supplies and services provided by employees'"; "TriWest's exclusions for network arrangements

($[XXXXX]); non-biddable costs ($[XXXXX] billion); and governmental units and government-endorsed monopolies ($[XXXXX] million)." *Id.* at 30; and

- "[A]ny of the relevant facts underpinning HNFS' misrepresentation allegations prior to awarding the contract to TriWest." *Id.*

Plaintiff presents arguments nearly identical to those discussed *supra* Section V, but focuses on DHA's alleged failure to request documentation or ask questions, contending this renders the agency's award arbitrary and capricious. Pl.'s MJAR at 23. For analogous reasons to those discussed *supra*, each of plaintiffs arguments fail. First, the agency rationally concluded TriWest: (1) included an accurate calculation of subcontracting costs; (2) identified small businesses in the proposal to perform under the contract; (3) included adequate participation of small businesses; and (4) demonstrated good faith efforts or plans to meet the Solicitation's subcontracting goals to the maximum extent practicable. *See supra* Section V.A. The agency therefore was not required to further inquire as to TriWest's small business additions or cost exclusions. Second, the Court determined *supra* TriWest's assertions did not amount to material misrepresentation; thus, none of the "relevant facts underpinning HNFS' misrepresentation allegations" amount to material misrepresentation. *See supra* Section V.B. Third, TriWest's proposal presented no reasonable indication TriWest presented false assertions which would have required DHA to "investigate" more than the agency did. *See Garufi*, 238 F.3d at 1333 ("[A] bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" (quoting *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 19973)); Pl.'s MJAR at 31. The contracting officer is "generally entitled to rely on a contractor's certifications" and has no obligation to undertake a fishing expedition to find documents disproving TriWest's assertions. *See Harmonia*, 999 F.3d at 1405. As such, DHA's award was not arbitrary and capricious because DHA adequately assessed TriWest's subcontracting plan before award, and the agency was not required to further inquire into the items plaintiff alleges *supra*. *See supra* Section V; *Garufi*, 238 F.3d at 1332 ("[T]he procurement official's decision [did not] lack[] a rational basis.").

## VII. Whether DHA's Best-Value Decision Was Arbitrary and Capricious and Based on DHA's Alleged Prejudicial Errors

Much of the parties' prejudice arguments ultimately hinge on whether the Solicitation's Small Business Subcontracting 25 percent goal is a strict requirement for award. For Health Net to prove prejudice, it must show Health Net had a substantial chance of receiving the award, which is much more likely if the goal was a strict requirement. *See Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996) (indicating to establish prejudice "a protester must demonstrate that but for the alleged error, there was a '"substantial chance that [it] would receive an award"'" (quoting *CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1574–75 (Fed. Cir. 1983)). Plaintiff's brief addresses four prejudice arguments: (1) DHA's Factor 4 evaluation; (2) DHA's errors in its evaluation of TriWest's past performance information, (3) DHA's errors in its evaluation of TriWest's technical proposal, and (4) DHA's responsibility determination. Pl.'s MJAR at 47. The Court will only address plaintiff's first prejudice

argument related to DHA's Factor 4 evaluation in this section, given the connection between DHA's Factor 4 evaluation and a 25 percent goal or requirement.[14]

As an initial matter, plaintiff raised a prejudice argument based on material misrepresentation at oral argument but not in its MJAR.  At oral argument, plaintiff could not clearly articulate its position at oral argument, blending its material misrepresentation argument and its prejudice argument:

> [PLAINTIFF:]  The point is . . . the prejudice is there by even allowing them to be in this competition . . . and this was not just based off of the acceptance of the revised proposal, but the prejudice was even allowing them to respond to the questions further . . . during the course of corrective action . . . because once it became clear that there were misrepresentations, . . . it's our position that the elimination . . . should have occurred at that time.  So the prejudice is . . . if it should have been grounds for elimination, whether during corrective action or as a result of the final revised proposal, Health Net's the only offeror remaining in this competition, and it certainly has an impact on the outcome of the evaluation and award decision.

Tr. at 24:8–22.  Plaintiff could not point to language in its MJAR to support its explanation above.  Tr. at 23:18–24:22.  Plaintiff then cited *GTA Containers* as a primary case for prejudice, despite the case addressing material misrepresentation rather than prejudice.  Tr. at 47:7–15 ("THE COURT:  What's your best case for prejudice, though? . . .  [PLAINTIFF]: . . . *GTA Containers* is an example of a misrepresentation case . . . .  THE COURT: . . . [S]o *GTA Containers* found that the offeror there had intentionally misrepresented in order to secure reliance from the Government.  That's . . . the best parallel, then, to this situation?"); *see GTA Containers, Inc. v. United States*, 103 Fed. Cl. 471 (2012).  Plaintiff argues the facts of *GTA Containers* are comparable to this case; in *GTA Containers*, however, the court found prejudice based on *material misrepresentation* when an awardee's proposal listed a supplier it did not intend to use.  *GTA Containers*, 103 Fed. Cl. at 483–86.  Here, the Court asked for a case to support plaintiff's argument related to *prejudice* and, as discussed *supra* Section V.B, there is no material misrepresentation in this case given TriWest's disclosures during corrective action.  *GTA Containers* accordingly does not support plaintiff's position.  The Court also notes the parties cite little caselaw to support their positions on treating the Solicitation's 25 percent goal as a requirement.  The government cites only to the administrative record.  Gov't Cross-MJAR at 33–34.  Plaintiff cites to *IAP Worldwide Services* to argue TriWest's 23.48% subcontracting

---

[14] The Court will address plaintiff's remaining three prejudice arguments with each corresponding arbitrary and capricious analysis, *see infra* Sections VIII, IX, X , because they are not directly related to the 25 percent issue.  Specifically, plaintiff at oral argument stated "DHA's errors in its evaluation of TriWest's past performance information" and "DHA's errors in its evaluation of TriWest's technical proposal" do not relate to the 25 percent goal.  Tr. at 27:18–22 ("THE COURT:  Count II, 'TriWest materially misrepresented its historical compliance with FAR 52[.219-8 & FAR 52.219-9], TriWest must be disqualified,' is that tied up with the 25 percent figure?  [PLAINTIFF]:  No, Your Honor."); Tr. at 30:12–16 ("THE COURT:  Count VIII, 'DHA's evaluation of TriWest's technical merit and technical risk under Factor 1 deviated from the RFP.'  [PLAINTIFF]: . . . [T]hat's not related to the 25 percent number.").  Plaintiff's prejudice argument related to "DHA's responsibility determination" is independent of plaintiff's prejudice arguments about whether the Solicitation's Small Business Subcontracting 25 percent goal is a strict requirement for award.  *See infra* Section X.

percentage calculation is "post hoc," contrary to *Regents* and *Chenery*, and should not be considered by this Court. *See* Pl.'s Reply at 17–18 (first citing *IAP Worldwide Servs., Inc. v. United States*, 160 Fed. Cl. 57 (2022); then citing *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020); and then citing *Chenery*, 318 U.S. 80 (1943)). *IAP*, however, does not support an interpretation of the Solicitation's 25 percent goal being a hard requirement. In *IAP*, the government asserted remand would be futile, and the court determined relying on such assertion would be post-hoc rationalization. *IAP*, 160 Fed. Cl. at 84. In this case, however, the Court need not determine what an agency would determine on remand, but instead whether the Solicitation itself treated 25 percent as a strict requirement, rather than a goal.

The government and TriWest refer to the 25 percent number as a "goal" in their briefing. *See* Gov't Cross-MJAR *passim*; TriWest Cross-MJAR *passim*. Plaintiff refers to 25 percent as a goal *and* requirement throughout its brief. *See, e.g.*, Pl.'s MJAR at 5 ("Given the pass-fail nature of these requirements, it was essential that offerors provide accurate proposal information . . . ."); *id.* at 4–5 ("DHA was . . . required to evaluate offerors' subcontracting plans for compliance with FAR 19.704 (Subcontracting Plan Requirements), which included, meeting the Solicitation's percentage goals for using small businesses . . . ."). When the Court questioned plaintiff at oral argument about prejudice and the 25 percent number being a goal rather than a requirement, plaintiff at first responded: "[T]he Government . . . doesn't know what TriWest has proposed. So this is not simply about a decrement of 2 percent. This . . . comes down to a fundamental question of the team that accounts for that, even if it is 23 percent."). Tr. at 34:3–10. Plaintiff's response provided no additional clarity. When the Court further asked plaintiff about the Solicitation not having language about the 25 percent number being a hard requirement, plaintiff conceded 25 percent was not a strict requirement. Tr. at 37:5–11 ("[PLAINTIFF]: I don't think we've taken a position that the 25 percent, standing alone, is a strict requirement. It's about the factor as a whole, and the demonstration with regard to all of the components of that factor, of whether there is a demonstration that the offeror clearly meets . . . every single one of the elements under Factor 4."); *see also* Tr. at 45:23–25 ("[PLAINTIFF]: If it was 23 percent, . . . again, this is not a black and white, 23 percent therefore means the plan is acceptable."). Plaintiff explained DHA's determination of acceptability under Factor 4 was "not just about the number" but rather the offeror's *plan* to achieve the 25 percent. Tr. at 26:6–13 ("[PLAINTIFF]: . . . [I]t's not just about the number. It is about how an offeror is explaining and demonstrating in a plan and a full submission of how its efforts align to achievement of that number . . . ."). Ultimately, plaintiff does not dispute *de minimis* differences would be acceptable. Tr. at 53:2–6 ("[PLAINTIFF]: . . . [W]hat we agree with here in that it has to also demonstrate good faith efforts for the use to the maximum extent practical. It's not like the number is a quota. It is necessarily aligned with an individual offeror's efforts, approach.").

At oral argument, the government argued the Solicitation required offerors only to demonstrate good faith efforts in meeting 25 percent. Tr. at 37:22–38:2 ("[GOVERNMENT:] [I]f the offeror has demonstrated good faith efforts or plans to . . . meet the goals to the maximum practicable, then whether the number is 25 percent, 23 percent, . . . 15 percent even could be acceptable under that."). The government stated "really, any number could be fine there as long as . . . the offeror is showing that it's making good faith efforts to meet . . . DHA's goals to the maximum extent practical." Tr. at 52:22–25. The government noted also "[i]n order for Health Net to demonstrate prejudice, it would need to demonstrate at least a substantial

chance that . . . the small business factor would have been found unacceptable, and adding $[XXXXX] million to the denominator, even if TriWest didn't add more small business numbers, just that . . . doesn't move the needle."  Tr. at 35:6–12.

The Solicitation states, as discussed *supra*:

The Government will evaluate the subcontracting plan and participation of small businesses on an acceptable/non-acceptable basis.  Acceptable—Proposal *clearly meets the minimum requirements of the solicitation* (Strengths are not assessed for this evaluation).  Unacceptable—Proposal does not clearly meet the minimum requirements of the solicitation. . . .

The Government will assess how the Offeror's *proposed subcontracting goals compare with the following subcontracting goals*. . . .  The Subcontracting *goals* are as follows:

• Small Business Subcontracting:  25%

AR at 5645 (TAB 87) (Final Amendment to T-5 Solicitation) (emphasis added).  Solicitation Section M—Evaluation of Factor 4, Small Business Participation—states the CO's evaluation process should be in compliance with Section L.5.2 of the Solicitation, which also refers to the 25 percent as a goal.  *Id.*; AR at 5594–96 (TAB 87) (Final Amendment to T-5 Solicitation).

Addressing a similar issue in *FirstLine Transportation Security, Inc. v. United States*, 107 Fed. Cl. 189 (2012), Judge Wheeler held the subcontracting goal was not a requirement, such that the agency had the ability to "negotiate the best small business arrangement" for the procurement.  *FirstLine Transp.*, 107 Fed. Cl. at 194 ("However, after careful consideration, the Court cannot say that the agency's approach is clearly unlawful, or that the approach lacks a rational basis.  As Defendant's counsel has emphasized, the 40 percent small business objective is merely a solicitation goal, not a requirement.  The agency will be free to negotiate the best small business arrangement it can prior to contract award.").  Plaintiff in *First Line* "challenged the 40 percent small business participation standard on the understanding that it constituted a bright-line requirement, not a goal," during questions with the Agency as part of the procurement process.  *Id.* at 199.  In response, the Agency in *First Line* amended their response during questioning to state:

Failure to meet the stated 40% small business participation goal *would not necessarily render a proposal ineligible* for award.  However, the U.S. Small Business Administration (SBA) is responsible for ensuring that the government-wide goal for participation of small business concerns is established annually at the statutory levels, and the reporting agencies' (to include the Department of Homeland Security, of which TSA is a component) achievements are relative to the goals.  Consistent with these goals, TSA fully supports participation of small businesses in all full and open competitions, such as the current solicitation, to the greatest extent possible.  Offerors for this solicitation are therefore *strongly encouraged to aggressively support the small business participation goals* stated in

the solicitation. In the context of these goals and the locality for which an offeror develops its individual subcontracting plan, the TSA Contracting Officer will review any proposed subcontracting plan *to ensure that the offeror has demonstrated due diligence in its efforts to meet the stated goals*.

*Id.* at 198–99 (emphasis added). Judge Wheeler explained "Section L.6 of the solicitation state[d] that the 'Government anticipates an overall Small Business *goal* of 40 percent.'" *Id.* at 195 (emphasis added). Judge Wheeler reasoned, "[b]y its plain terms, Section L.6 is simply not that draconian: it does not speak in terms of failing to meet a bright-line threshold, but rather in terms of 'fail[ing] to negotiate a subcontracting plan acceptable to the contracting officer before contract award[.]'" *Id.* at 202 (first alteration added). Judge Wheeler also explained the Solicitation stated: "[t]he contracting officer will review the subcontracting plan for adequacy, ensuring that the required information, goals and assurances are included in accordance with FAR 19.705-4." *Id.* at 198. Judge Wheeler concluded "neither Section L.6 [of the Solicitation] nor FAR 19.705-4 converts the 40 percent goal into a bright-line requirement." *Id.* at 203.

In this case, based on the plain language of the Solicitation, DHA stated it would evaluate an offeror's "proposed subcontracting goals [and] compare with the following subcontracting goals." AR at 5645 (TAB 87) (Final Amendment to T-5 Solicitation); Pl.'s MJAR at 5. Specifically, Solicitation Section M—Evaluation of Factor 4, Small Business Participation—refers to the 25 percent subcontracting percentage as a goal numerous times. *See, e.g.*, AR at 5594–96 (TAB 87) (Final Amendment to T-5 Solicitation) ("The Government will assess how the Offeror's proposed subcontracting *goals* compare with the following subcontracting goals. The Government will assess the extent the Offeror identifies businesses in the Plan and demonstrated good faith efforts or plans to meet the below *goals* using small business . . . subcontractors to the maximum practicable. The Subcontracting *goals* are as follows: Small Business Subcontracting: 25% . . . ." (emphasis added)). Solicitation Section M refers to Section L.5.2 of the Solicitation, which also refers to the 25 percent subcontracting percentage as a goal. AR at 5594–96 (TAB 87) (Final Amendment to T-5 Solicitation) ("The following 13 elements of FAR 19.704 are required to be included in Offeror's subcontracting plan: (1) Separate percentage *goals* for using small business[es] . . . as subcontractors; . . . (4) A description of the method used to develop the subcontracting *goals*; . . . (6) A statement as to whether or not the Offeror included indirect costs in establishing subcontracting *goals* . . . ; (11) A description of the types of records that will be maintained concerning procedures adopted to comply with the requirements and *goals* in the plan . . . ." (emphasis added)). Plaintiff concedes the Solicitation refers to the subcontracting requirement as a goal: "DHA was . . . required to evaluate offerors' subcontracting plans for compliance with FAR 19.704 (Subcontracting Plan Requirements), which included, meeting the Solicitation's percentage goals for using small businesses." Pl.'s MJAR at 4–5 (citing AR at 5594 (TAB 87) (Final Amendment to T-5 Solicitation)). FAR 19.705-4, related to FAR 19.704, refers to subcontracting plans in general as "goals" rather than requirements. FAR 19.705-4 ("The [CO] shall review the subcontracting plan for adequacy, ensuring that the required information, *goals*, and assurances are included (see 19.704). . . . (3) The relative success of methods the contractor intends to use to meet the *goals* and requirements of the plan . . . . Subcontracting *goals* should be set at a level that the parties reasonably expect can result from the offeror expending good faith efforts to use small business . . . to the

maximum practicable extent. . . .  (2) In accordance with 15 U.S.C. [§] 637(d)(4)(F)(iii), [the CO should] ensure that the *goals* offered are attainable . . . ." (emphasis added)).

Like Judge Wheeler in *FirstLine Transportation*, the Court finds the Solicitation's subcontracting plan percentage is a goal, rather than a requirement, based on the plain language of the Solicitation and corresponding FAR provisions.  *See FirstLine Transp.*, 107 Fed. Cl. at 194; AR at 5594–96, 5645 (TAB 87) (Final Amendment to T-5 Solicitation); FAR 19.705-4.  The dictionary definition of "goal" is:  "the end toward which effort or ambition is directed:  aim, purpose."  *Goal*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED (Philip Babcock Gove ed., 2002).  The dictionary definition does not require a goal to be a strict requirement, only a "directed" "effort or ambition."  *Id.*  The parties ultimately agreed at oral argument an offeror need only have a plan to meet 25 percent and therefore the 25 percent was a goal.  Tr. at 26:10–13 ("[PLAINTIFF:]  [I]t's not just about the number.  It is about how an offeror is explaining and demonstrating in a plan and a full submission of how its efforts align to achievement of that number . . . ."); Tr. at 53:2–6 ("[PLAINTIFF:]  [W]hat we agree with here in that it has to also demonstrate good faith efforts for the use to the maximum extent practical.  It's not like the number is a quota.  It is necessarily aligned with an individual offeror's efforts, approach."); Tr. at 37:22–38:2 ("[GOVERNMENT:] [I]f the offeror has demonstrated good faith efforts or plans to . . . meet the goals to the maximum extent practicable, then whether the number is 25 percent, 23 percent, . . . 15 percent even could be acceptable under that.").  The Court agrees with the government "really, any number could be fine there as long as . . . the offeror is showing that it's making good faith efforts to meet . . . DHA's goals to the maximum extent practical."  Tr. at 52:22–25.  The 25 percent "goal" therefore is not seemingly pass-fail in nature.  *See FirstLine Transp.*, 107 Fed. Cl. at 194.  The Court cannot treat a "goal" the same as a requirement and "must stay its hand and refrain from interfering with the procurement process" when a certain portion of the Solicitation is a goal.  *Id.*  Accordingly, the Court holds the Solicitation's subcontracting percentage was a goal rather than a requirement, and, therefore, TriWest's percentage of 23.48% would not be materially different from the goal of 25 percent.  Although the Court finds the agency was not arbitrary and capricious in evaluating TriWest's exclusions to precisely meet the 25 percent goal, *see supra* Sections V.A.1–2, even if TriWest's post-corrective action subcontracting proposal fell below 25 percent, plaintiff has not proven TriWest's proposal failed to meet the 25 percent goal, as the goal was not a strict requirement.  *Adv. Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000) ("The arbitrary and capricious standard applicable here is highly deferential.  This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors. . . .  [The agency's] evaluations of the offers in the bid were reasonable and complied with the solicitation."), *quoted in First Line Transp.*, 107 Fed. Cl. at 196.

A bid protest plaintiff must establish alleged "errors in the procurement process significantly prejudiced" plaintiff by showing "there was a 'substantial chance' it would have received the contract award but for the errors."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1353 (Fed. Cir. 2005) (quoting *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)).  Health Net has not shown it would have substantial chance of being awarded the contract had TriWest's small business subcontracting plan have fallen below the 25 percent goal, given the plan post-corrective action would likely be "Acceptable" at 23.48%.  *Id.*

Plaintiff alleges various errors in the agency's review do not relate to the Solicitation's 25 percent goal, as plaintiff has not shown the agency improperly determined TriWest's subcontracting plan met the 25 percent goal, even if the planned subcontracting percentage was less than 25 percent. *See supra* note 13 and accompanying text.  To the extent these issues are not addressed by the Solicitation's subcontracting goal, the Court further determines whether the alleged errors are prejudicial in the Sections *infra*.  The Court, however, finds DHA's best-value decision was not arbitrary and capricious.  *Adv. Data Concepts*, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential.  This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors. . . .  [The agency's] evaluations of the offers in the bid were reasonable and complied with the solicitation."), *quoted in First Line Transp.*, 107 Fed. Cl. at 196.

## VIII.   Whether DHA's Evaluation of TriWest's Past Performance Regarding Small Business Subcontracting Was Arbitrary and Capricious

Plaintiff argues "DHA did not consider the impact of TriWest's representations regarding compliance with FAR 52.219-8 and FAR 52.219-9 in connection with TriWest's past performance references for the VA PC3, CCN R4, and CCN R5 contracts."  Pl.'s MJAR at 40.  Plaintiff asserts:  "All evidence before DHA (including AR Tab 425) indicated TriWest had been erroneously calculating its subcontracting spending since at least 2004 by improperly excluding large swaths of subcontracting spending."  *Id.*  Plaintiff explains "[d]espite existence of this evidence demonstrating TriWest's historical subcontracting practices, DHA unreasonably concluded that '[o]verall, the PPET assessed the Offeror to have satisfactory performance in meeting small business subcontracting goals.' . . . This too was arbitrary and capricious."  *Id.* at 41 (quoting AR at 12401 (TAB 120) (TriWest Past Performance Evaluation Team Report)).  Plaintiff argues:  "DHA was required to ask further questions before making award" about "T-3 documentation in the evaluation record."  *Id.* at 30.  The government responds:  "DHA rationally concluded that TriWest has a satisfactory record of compliance with FAR 52.219-8 and 52.219-9, based upon TriWest's subcontracting reports submitted with its proposal, past performance questionnaires, and [(Contractor Performance Assessment Reporting System Reports (CPARS)]."  Gov't Cross-MJAR at 24 (citing AR at 12400–01 (TAB 120) (TriWest Past Performance Evaluation Team Report)).  The government argues:  "DHA was under no obligation to question the VA's assessment of TriWest's past performance with regard to small business subcontracting based on information that was not contained in TriWest's proposal, such as TriWest's approved small business subcontracting plans from its VA contracts."  *Id.* at 25.  The government reasons "[w]hether the subcontracting plans that TriWest negotiated with the VA excluded any categories of subcontracts that Health Net (or DHA) believes should be included does not affect TriWest's 'quality of performance' under those contracts, as TriWest was expected to comply with the subcontracting plans negotiated for those contracts during contract performance."  *Id.* at 26–27 (emphasis omitted).  The government argues, "DHA reasonably relied on the VA's evaluation of TriWest's contract performance to determine that TriWest had a satisfactory record of small business subcontracting."  *Id.* at 27.

The Solicitation required offerors to submit "a record of its compliance with FAR 52.219-8 Utilization of Small Business Concerns and 52.219-9, Small Business Subcontracting Plan including past eSRS, if applicable, and all correspondence with the cognizant CO or Small

Business Specialist regarding its compliance for the past three (3) years on current or past Government contracts." AR at 5613 (TAB 87) (Final Amendment to T-5 Solicitation). Here, TriWest submitted seven past performance contracts for the T-5 procurement and, of further relevance, included its past performances for Department of Veterans Affairs (VA) Patient-Centered Community Care (PC3), VA Community Care Network Region 4 (CCNR4), and VA Community Care Network Region 5 (CCNR5). AR at 10146–64 (TAB 104) (TriWest Initial Proposal). TriWest's proposal explained its small business goal performance, including its compliance record, and included Individual Subcontracting Reports (ISRs) demonstrating TriWest's performance with regard to small business goals under PC3, CCN R4, and CCN R5. *See* AR at 10165–10200 (TAB 104) (TriWest Initial Proposal). TriWest explained:

> During the three year's ended March 31, 2019, 2020, and 2021, TriWest has exceeded the majority of contractual Small Business (SB) goals to date, far outpacing the spend in dollars originally estimated in approved plans. We continue to demonstrate our commitment to the Government's objectives and to Veteran-Owned and Service-Disabled Veteran-Owned Small Businesses (VOSB and SDVOSB) by not only exceeding the contractual goals, but by increasing achievement in other key socio-economic categories and striving to meet or exceed the goals on a percentage basis as well. As with many organizations, we are challenged to meet the percentage objectives in certain historically challenging areas, such as [XXXXX].

AR at 10165 (TAB 104) (TriWest Initial Proposal). For its PC3 contract, TriWest included the following Exhibit in its proposal to "illustrate[] [its] actual small business performance in each category (i.e., SB, VOSB, SDVOSB, Woman Owned Small Business [WOSB], Small Disadvantaged Business [SDB], and HUBZone) [under PC3] and demonstrate[] [its] continued commitment to exceeding the established goals":

**Exhibit 1: Small Business Performance for PC3**

| Period End (Cum.) | Small | VOSB | SDVOSB | WOSB | SDB | HUBZone |
|---|---|---|---|---|---|---|
| Mar-19 | | | | | | |
| Mar-20 | | | | | | |
| Mar-21 | | | | | | |

**Figure 7**

*Id.* For its CCN R4, TriWest included the following Exhibit in its proposal to "illustrate[] [its] actual SB performance in each category and demonstrate[] [its] continued commitment to exceeding the established goals":



Exhibit 2: Small Business Performance for CCN R4

| Period End (Cum.) | Small | VOSB | SDVOSB | WOB | SDB | HUB |
|---|---|---|---|---|---|---|
| Mar-20 | | | | | | |
| Mar-21 | | | | | | |

**Figure 8**

AR at 10187 (TAB 104) (TriWest Initial Proposal).  For its CCN R5, which "began October 1, 2020 and ran through March 31, 2021," TriWest included the following Exhibit in its proposal to "illustrate[] [its] actual SB performance in each category":

Exhibit 3: Small Business Performance for CCN R5

| Period End (Cum.) | Small | VOSB | SDVOSB | WOB | SDB | HUB |
|---|---|---|---|---|---|---|
| Mar-21 (First report) | | | | | | |

**Figure 9**

AR at 10197 (TAB 104) (TriWest Initial Proposal).  TriWest in sum states:  "TriWest is committed to the Government's small and disadvantaged business utilization goals . . . .  The two newest contracts reported above identify short-term deficiencies in goal achievement[,] . . . [but] the VA PC3 contract first reported above demonstrates steady state performance on a mature contract."  AR at 10200 (TAB 104) (TriWest Initial Proposal).

TriWest's CPARS reports demonstrated ratings of "Very Good" or "Satisfactory":

- For PC3 from September 2013 to September 2014, TriWest's Small Business Subcontracting received a rating of "Satisfactory," AR at 12556 (TAB 122) (TriWest CPARS Reports);
- For PC3 from September 2014 to July 2015, TriWest's Small Business Subcontracting received a rating of "Satisfactory," AR at 12564 (TAB 122) (TriWest CPARS Reports);
- For PC3 from July 2015 to September 2016, TriWest's Small Business Subcontracting received a rating of "Satisfactory," AR at 12504 (TAB 122) (TriWest CPARS Reports);
- For PC3 from October 2016 to September 2017, TriWest's Small Business Subcontracting received a rating of "Satisfactory," AR at 12516 (TAB 122) (TriWest CPARS Reports);
- For PC3 from October 2018 to September 2019, TriWest's Small Business Subcontracting received ratings of "Very Good," AR at 12533, 12536 (TAB 122) (TriWest CPARS Reports);

- For PC3 from October 2019 to September 2020, TriWest's Small Business Subcontracting received a rating of "Very Good," AR at 12543 (TAB 122) (TriWest CPARS Reports);
- For PC3 from September 2020 to September 2021, TriWest's Small Business Subcontracting received a rating of "Very Good," AR at 12548–49 (TAB 122) (TriWest CPARS Reports); and
- For CCN R4 from October 2019 to March 2020, TriWest's Small Business Subcontracting received a rating of "Satisfactory," AR at 12570 (TAB 122) (TriWest CPARS Reports);
- For CCN R5 from October 2020 to September 2021, TriWest's Small Business Subcontracting received a rating of "Satisfactory," AR at 12574 (TAB 122) (TriWest CPARS Reports).

For TriWest's Past Performance Questionnaires (PPQs) completed by an Administrative Contracting Officer and Contracting Officer from the Department of Veterans Affairs (VA), TriWest received "Very Good" or "Satisfactory" reviews of its small business subcontracting:

| Met contractual Small Business goals? | X | | |
|---|---|---|---|
| **If "No"** for any of the above explain how the performance did not meet contractual requirements: | | | |

**Figure 10A**

| Overall Assessment | | | | | | |
|---|---|---|---|---|---|---|
| Evaluation: | E | V | S | M | U | NA |
| Based on the above responses and any other facts, what was the overall rating you would assign to the contractor? | | X | | | | |
| **If other than "*Satisfactory*,"** explain how the performance exceeds or does not meet contractual requirements:<br><br>This assessment rating was based on latest CPARS (which is the typical representation of the Contractor) where the Contractor was rated "Very Good" in Four Areas (Quality, Schedule, Small Business Subcontracting, and Regulatory Compliance) and rated "Exceptional" in one area (Management). The Contractor always performs above standards of the contract and is very flexible in regard to additional Government requirements and/or concerns. | | | | | | |

**Figure 10B**

| Met contractual Small Business goals? | X | | |
|---|---|---|---|

**If "No"** for any of the above explain how the performance did not meet contractual requirements: The Contractor has had some

| Overall Assessment | | | | | | |
|---|---|---|---|---|---|---|
| Evaluation: | E | V | S | M | U | NA |
| Based on the above responses and any other facts, what was the overall rating you would assign to the contractor? | | X | | | | |

**If other than "*Satisfactory*,"** explain how the performance exceeds or does not meet contractual requirements:

**Figure 11**

| Met contractual Small Business goals? | V | | |
|---|---|---|---|

**If "No"** for any of the above explain how the performance did not meet contractual requirements:

**Figure 12A**

| Overall Assessment | | | | | | |
|---|---|---|---|---|---|---|
| Evaluation: | E | V | S | M | U | NA |
| Based on the above responses and any other facts, what was the overall rating you would assign to the contractor? | | X | | | | |

**If other than "*Satisfactory*,"** explain how the performance exceeds or does not meet contractual requirements:

**Figure 12B**

AR at 12461–62 (TAB 121) (TriWest PPQs, 29 July 2021); AR at 12467 (TAB 121) (TriWest PPQs, 30 July 2021); AR at 12472–73 (TAB 121) (TriWest PPQs, 26 July 2021).

DHA concluded TriWest had met the Solicitation requirements regarding past performance and compliance with FAR 52.219-8 and 52.219-9 after reviewing TriWest's proposal, CPARS reports, and PPQs:

> **Small Business Compliance:**
> As required by M.8.5.2 of the RFP, in assessing quality of performance, the PPET considered the Offeror's past performance in compliance with clause FAR 52.219-8, Utilization of Small Business Concerns, and clause FAR 52.219-9, Small Business Subcontracting Plan.  The [Past Performance Evaluation Team,] PPET[,] considered the Offeror's proposal, to include its submitted record of compliance in accordance with L.7.7 of the RFP, PPQ responses, and available CPARS reports in its assessment.  The PPET notes that in its submitted record of compliance, the Offeror appears to have a submitted only a partial record, including only a single Summary Subcontractor Report (SSR) for 2019 for contracts held with the VA.
>
> Each of the three PPQs for TriWest's prime contracts reflected that it met its contractual small business goals and generally reflected "Very Good" for the quality of performance as to small business subcontracting.
>
> In its submitted record of compliance, the Offeror acknowledged that they have been "challenged to meet the percentage objectives in certain historically challenging areas, such as [XXXXX]."  This is consistent with PPET's assessment that the Offeror has a record of meeting their overall small business subcontracting goals in terms of dollars, but has failed to meet some of their sub-category goals. Overall, the PPET assessed the Offeror to have *satisfactory performance* in meeting small business subcontracting goals.

AR at 12400–01 (TAB 120) (TriWest Past Performance Evaluation Team Report) (emphasis added).

TriWest's proposal, CPARS reports, and PPQs demonstrate a strong record of meeting small business goals.  TriWest's proposal explained its compliance record for small business goal performance.  AR at 10165–101200 (TAB 104) (TriWest Initial Proposal).  All TriWest's CPARS reports include ratings of "Very Good" or "Satisfactory" for "Small Business Subcontracting."  AR at 12504–75 (TAB 122) (TriWest CPARS Reports).  TriWest's Past Performance Questionnaires (PPQs) reflect "Very Good" or "Satisfactory" reviews of its small business subcontracting.  AR at 12461–73 (TAB 121) (TriWest PPQs).  Given TriWest's strong record in its subcontracting reports, DHA "assessed [TriWest] to have satisfactory performance in meeting small business subcontracting goals."  AR at 12400–01 (TAB 120) (TriWest Past Performance Evaluation Team Report) (emphasis added).  The evidence before DHA showed TriWest has a satisfactory record of compliance with FAR 52.219-8 and 52.219-9, including its

proposal, CPARS reports, and PPQs.  DHA explained the PPET "considered the Offeror's proposal, to include its submitted record of compliance in accordance with L.7.7 of the RFP, PPQ responses, and available CPARS reports in its assessment" and found TriWest "to have satisfactory performance in meeting small business subcontracting goals."  AR at 12400–01 (TAB 120) (TriWest Past Performance Evaluation Team Report) (emphasis added).  As the agency's review indicates, TriWest often failed to meet subcontracting goals in [XXXXX] for its PC3 contract.  *See* AR at 12400–08 (TAB 120) (TriWest Past Performance Evaluation Team). In addition, the review shows TriWest "ha[s] not [met its] Small Business contracts goals set for [XXXXX] of the [XXXXX] subcategories of Small Business" for CCNR4 and CCNR5.  AR at 12424, 12436 (TAB 120) (TriWest Past Performance Evaluation Team).  Nevertheless, the agency determined, as a whole, TriWest demonstrated "satisfactory performance," due in part to TriWest "meeting their overall small business subcontracting goals in terms of dollars."  *Id.*  The agency determined TriWest's PC3 small business performance "demonstrated a clear commitment to exceeding their established goals," and for TriWest's CCN R4 and CCN R5 contracts, the agency "believe[d] there ha[d] not been enough time on this contract to illustrate TriWest's ability to achieve or not achieve their Small Business goals."  AR at 12408, 12425, 12437 (TAB 120) (TriWest Past Performance Evaluation Team).  There is nothing in the record to indicate the agency improperly evaluated these past performance shortcomings to conclude TriWest as a whole, demonstrated satisfactory performance.  AR at 12424, 12436 (TAB 120) (TriWest Past Performance Evaluation Team).  As such, DHA's award was not arbitrary and capricious because DHA thoroughly assessed TriWest's proposal, CPARS reports, and PPQs before award and correctly found TriWest's "past performance in compliance with clause FAR 52.219-8, Utilization of Small Business Concerns, and clause FAR 52.219-9, Small Business Subcontracting Plan," AR at 12400 (TAB 120) (TriWest Past Performance Evaluation Team), in light of the overwhelming evidence of compliance with meeting small business goals.  *Garufi*, 238 F.3d at 1332 ("[T]he procurement official's decision [did not] lack[] a rational basis.").

The crux of Health Net's argument is DHA should have "ask[ed] further questions before making award" about "TriWest's past performance references for the VA PC3, CCN R4, and CCN R5 contracts" because "problems likely existed in TriWest's performance examples."  Pl.'s MJAR at 30, 40–41.  Plaintiff's only cited evidence of "problems likely in existe[nce]," however, is TriWest's T-3 proposal, which is unrelated to the VA contracts plaintiff challenges.  *See id.* Plaintiff alleges the "evaluation record" of the T-3 contract and TriWest's calculation of subcontracting spending there should have put DHA on notice its VA evaluations may have been tainted.  *Id.* at 40.  More narrowly, Health Net alleges, based on TriWest's T-3 proposal, "[a]ll evidence before DHA . . . indicated TriWest had been erroneously calculating its subcontracting spending."  *Id.* at 41 ("Despite . . . TriWest's historical subcontracting practices,[15] DHA

---

[15] Plaintiff argues in its Complaint TriWest's historical subcontracting practices were erroneous.  *See* Am. Compl. at 80–82 (Count VI—DHA Arbitrarily and Capriciously Accepted TriWest's Revised Subcontracting Goals, Which Were Based Upon TriWest's Historical Performance Against Improperly Calculated and Reported Small Business Participation).  Plaintiff argues "TriWest conceded that it has been improperly excluding network subcontractor costs from the denominator of its small business subcontracting calculation since 2009."  *Id.* at 81.  Plaintiff states "TriWest's statements indicate that TriWest has been relying on these unlawful exclusions for not only the T-5 West procurement, but also for TriWest's subcontracting approach over the past 14 years—i.e., TriWest's historical experience."  *Id.* at 82.  While plaintiff does not separately address Count VI in its MJAR, plaintiff makes similar arguments related to TriWest's past performance, asserting TriWest's historical subcontracting practices undercut the validity of its VA PC3, CCN R4, and CCN R5 contracts.  Pl.'s MJAR at 30, 40.  To the extent plaintiff's Count

unreasonably concluded that [TriWest had] . . . 'satisfactory performance in meeting small business subcontracting goals.' . . . Because all evidence before the Agency indicated that problems likely existed in TriWest's performance examples, DHA was required to resolve the inconsistencies before award and consider TriWest's historical compliance with subcontracting requirement as part of its past performance evaluation." (quoting AR at 12400–01 (TAB 120) (TriWest Past Performance Evaluation Team)).

First, the contracting officer is "generally entitled to rely on a contractor's certifications" and has no obligation to undertake a fishing expedition to find documents disproving TriWest's assertions. *See Harmonia Holdings Grp., LLC v. United States*, 999 F.3d 1397, 1405 (Fed. Cir. 2021). Furthermore, evaluation of previous awards—even within the same agency—are merely persuasive authority for a contracting officer. To the extent the contracting officer here could have asked for and considered TriWest's VA contract proposals, he would have been entitled to disregard any differences while relying on the VA's performance evaluation. *See Sys. Stud. & Simulation, Inc. v. United States*, 146 Fed. Cl. 186, 200–01 (2019) ("[Plaintiff] maintain[s] that the [agency] failed to properly account for . . . staffing issues on prior contracts. . . . '[W]hen a Court reviews an evaluation of past performance . . . , "the greatest deference possible is given to the agency"' . . . . Exercising this deference, the court finds no error with the [agency's] evaluation of . . . past performance." (quoting *Walden Sec. v. United States*, 136 Fed. Cl. 216, 229 (2018))).

Second, the information provided by TriWest related to its past performance references presented no reasonable indication TriWest presented a lack of compliance with FAR 52.219-8 Utilization of Small Business Concerns, and FAR 52.219-9, Small Business Subcontracting Plan, which would have required DHA to further "investigate." *See Garufi*, 238 F.3d at 1333 ("[A] bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" (quoting *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)). TriWest's proposal, CPARS reports, and PPQs demonstrate a record of meeting small business goals: TriWest's proposal indicated a record of small business goal performance; TriWest's CPARS reports included ratings of "Very Good" or "Satisfactory"; and TriWest's PPQs reflect "Very Good" or "Satisfactory" reviews of its small business subcontracting. AR at 10165–10200 (TAB 104) (TriWest Initial Proposal); AR at 12504–74 (TAB 122) (TriWest CPARS Reports); AR at 12461–73 (TAB 121) (TriWest PPQs). The DHA assessed TriWest's "record of . . . compliance" based on the VA PC3, CCN R4, and CCN R5 contracts TriWest submitted. AR at 5613 (TAB 87) (Final Amendment to T-5 Solicitation). DHA found TriWest had "satisfactory performance in meeting small business subcontracting goals." AR at 12400–01 (TAB 120) (TriWest Past Performance Evaluation Team Report). Whether TriWest's subcontracting plans for the VA PC3, CCN R4, and CCN R5 *contained certain exclusions* is outside the scope of

---

VI argument is relevant to plaintiff's MJAR, the Court determined the agency and TriWest sufficiently addressed any errors of improper exclusion during corrective action. *See supra* Section V. To the extent plaintiff alleges the contracting officer improperly evaluated TriWest's exclusions in the context of past performance, the Court addresses this argument in relation to TriWest's VA contracts *infra* Section VIII. The Court further notes plaintiff acknowledged the historical performance arguments were merely the "factual underpinnings of the allegations" and not a "stand-alone" count. *See* Tr. at 55:1–15 ("THE COURT: What would be the grounds upon which the Court would make a decision . . . ? . . . . [PLAINTIFF:] [I]t is the factual underpinnings of the allegations. THE COURT: Okay. So there's no distinct MJAR argument? [PLAINTIFF]: As far as a stand-alone, you know, count . . . no. It is the facts that support the evaluation, investigation, and material misrepresentation allegations.").

DHA's required analysis under this Solicitation, as the Solicitation only called for DHA's review of TriWest's compliance with FAR 52.219-8 and 52.219-9.  AR at 5613 (TAB 87) (Final Amendment to T-5 Solicitation).  This Court has found COs in reviewing past performance evaluations are entitled to "the greatest deference possible." *See Sys. Stud. & Simulation, Inc.*, 146 Fed. Cl. at 200–01 ("[Plaintiff] maintain[s] that the [agency] failed to properly account for . . . staffing issues on prior contracts. . . .  '[W]hen a Court reviews an evaluation of past performance . . . , "the greatest deference possible is given to the agency"' . . . .  Exercising this deference, the court finds no error with the [agency's] evaluation of . . . past performance." (quoting *Walden Sec. v. United States*, 136 Fed. Cl. 216, 229 (2018)).  The only "evidence" of improper evaluation Health Net presents is TriWest's T-3 rejected proposal from 2008—16 years ago—which has no concrete connection to TriWest's VA PC3, CCN R4, and CCN R5 contracts performed for the VA.  Pl.'s MJAR at 30 ("[T]here is not a single mention of DHA's review of any T-3 documentation in the record . . . .  At a minimum, DHA was required to ask further questions before making [an] award.").  Plaintiff conceded it is unsure whether TriWest used the same erroneous subcontracting exclusions for VA PC3, CCN R4, and CCN R5 contracts as it did for T-3—arguing it is only "*likely* [the T-3 contracts have] the same subcontracting exclusions." Pl.'s MJAR at 29 (emphasis added).  As such, DHA had no reason to find TriWest's past performances under VA PC3, CCN R4, and CCN R5 as having "problems," as plaintiff argues. Pl.'s MJAR at 41.  Accordingly, DHA's award was not arbitrary and capricious because DHA adequately assessed TriWest's past performance references before award and in accordance with the Solicitation.  *See Sys. Stud. & Simulation, Inc.*, 146 Fed. Cl. at 200–01; *Garufi*, 238 F.3d at 1332 ("[T]he procurement official's decision [did not] lack[] a rational basis.").

Regarding prejudice, Health Net argues "DHA's errors in its evaluation of TriWest's past performance information . . . prejudiced HNFS [because] [h]ad DHA evaluated TriWest's proposal in accordance with the Solicitation, procurement law and regulation, DHA would not have found TriWest responsible or awardable."  Pl.'s MJAR at 46.  A bid protest plaintiff must establish alleged "errors in the procurement process significantly prejudiced" plaintiff by showing "there was a 'substantial chance' it would have received the contract award but for the errors."  *Bannum, Inc. v. United States*, 404 F.3d, 1346, 1353 (Fed. Cir. 2005) (quoting *Info. Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed. Cir. 2003)).  TriWest complied with the Solicitation's terms to submit "a record of its compliance with FAR 52.219-8 Utilization of Small Business Concerns and 52.219-9, Small Business Subcontracting Plan," AR at 5613 (TAB 87) (Final Amendment to T-5 Solicitation).  There were no errors in the procurement process related to DHA's evaluation of TriWest's past performance information; the Court finds DHA's decision was not arbitrary and capricious.  *Adv. Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000) ("The arbitrary and capricious standard applicable here is highly deferential.  This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors. . . .  [The agency's] evaluations of the offers in the bid were reasonable and complied with the solicitation.").

## IX.   Whether DHA'S Evaluation of TriWest's Technical Merit and Technical Risk Under Factor 1 Deviated from the RFP and Was Arbitrary and Capricious

Plaintiff argues "DHA's evaluation of TriWest's proposal . . . with respect to both technical merit and technical risk . . . was arbitrary and capricious." Am. Compl. at 91 (Count VIII). Plaintiff argues TriWest "is merely an integrator and subcontract manager relying on its subcontractors' resources and performance." Pl.'s MJAR at 43. Plaintiff points out "TriWest's proposal . . . distinguished between the 'TriWest Federal Network' and 'Localized Network Subcontractors' . . . [but] [n]otably missing from the entirety of TriWest's technical proposal is any definition of TriWest's own network as distinguished from that of its subcontractors." *Id.* at 44 (emphasis omitted). Plaintiff argues: "TriWest concealed the extent to which its purported 'Federal Network' was actually the patchwork of its leased subcontractors' networks." *Id.* Plaintiff also argues "DHA considered TriWest's accreditation, but never assessed what percentage of the network this represented, or what level of risk is presented by using a patchwork of networks the majority of which have not been confirmed to be URAC [(Utilization Review Accreditation Commission)] accredited." *Id.* at 45 (emphasis omitted). Plaintiff asserts "DHA had the opportunity to investigate further to allow it to conduct an informed evaluation . . . [b]ut, DHA chose not to do so . . . ." *Id.* at 46. The government responds: "TriWest's technical proposal clearly described how it will build its T-5 network, and . . . TriWest did not merely offer 'to cobble together a patchwork of numerous small networks of its subcontractors.'" Gov't Cross-MJAR at 20 (quoting Pl.'s MJAR at 44). The government explains "TriWest's existing, accredited 'Federal Network' is the network that it uses for its VA CCN and PC3 contracts." *Id.* at 20 (citing AR at 55144 (TAB 383) (TriWest Proposal)). The government notes "TriWest's proposal reflects that it has used network subcontractors to help populate its existing Federal Network . . . [b]ut that does not change the fact that TriWest has developed its own accredited Federal Network that it can draw from for its T-5 network, as its proposal explains." *Id.* at 20–21 (citing AR at 55144–45 (TAB 383) (TriWest Proposal)). The government argues "Health Net has not identified anything in DHA's extensive evaluations of TriWest's Network Management that indicates . . . DHA was confused about the nature of TriWest's existing Federal Network." *Id.* at 21. The government reasons "[u]nlike DHA, Health Net misunderstands TriWest's proposal" with regard to its network being accredited by URAC and "DHA's assessment of a strength for TriWest's URAC accreditation was rational." *Id.* at 22–23.

At oral argument, the government noted "TriWest['s] proposal was clear that it has its own federal network" and explained DHA gave a "very robust evaluation of [TriWest's] network management" within its technical proposal—"some 40 or 50 pages long." Tr. at 121:8–122:20. Plaintiff, when asked at oral argument about TriWest's network under the technical risk factor, stated "the problem again is we're getting into problematic vagueness in the proposal." Tr. at 123:15–17. Plaintiff ultimately did not dispute DHA thoroughly considered TriWest's technical proposal. Tr. at 124:24–126:9 ("THE COURT: [The government] . . . agreed this was a very important consideration, 40 to 50 pages by DHA in the evaluation. Do you dispute that? . . . [PLAINTIFF:] There's evaluation of the network itself without attribution, Your Honor. THE COURT: There's no attribution? What does that mean? [PLAINTIFF]: Again, this is understanding the level of control, DHA understanding who is going to be performing what. It's one thing for an offeror to demonstrate resources that are its own. Here, the RFP specifically required more information and commitments of offerors when they were not providing their own").

TriWest's proposal states:

TriWest has an accredited Federal network that covers all T-5 West Region states. . . . .

**TriWest Federal Network.**  Once we have sized the network using our Network Model (Section 1.2) to determine what providers are necessary to effectively support T-5, the foundation of our quick start network strategy will be to leverage our existing, accredited TriWest Federal Network used for our VA CCN and PC3 contracts.  This network of fully credentialed providers has a proven history of successfully supplementing the services of Federal health care facilities and resources, meeting the needs of its beneficiaries, and working in a consultative capacity with the beneficiary's primary care manager (PCM).  For the T-5 West region, our Federal Network has nationwide reach from supporting the VA PC3/VCP contract as VA transitions to the CCN program. . . .

. . .

**Localized Network Subcontractors.**  After using our existing Federal Network to identify providers to contract for our T-5 network, we will supplement with additional providers from our network subcontractors, most of whom have been supporting TriWest's Federal Network for more than 25 years.

AR at 55144–45 (TAB 383) (TriWest Proposal).

DHA reviewed TriWest's technical proposal in a 50-page evaluation.  *See* AR at 13236–85 (TAB 126) (DHA Evaluation of TriWest's Network).  In this evaluation, DHA considered TriWest's network approach and URAC accreditation in its evaluation of TriWest:

On Page II-7 of the proposal, the Offeror states that "the foundation of our quick start network strategy will be to leverage our existing, accredited TriWest Federal Network used for our VA CCN and PC3 contracts."  Additionally, the Offeror will supplement the network with providers from its network subcontractors, mainly Blue Cross Blue Shield.  On Pages II-12 &13, the Offeror shows that the current TriWest Federal Network is Utilization Review Accreditation Commission (URAC) accredited for its Health network, the accreditation expires August 1, 2023.  The Offeror has maintained URAC accreditation since 2005 for its network.  On Page II-13 of the proposal, the Offeror states that "TriWest will maintain our longstanding URAC network accreditation for T-5".

AR at 13241 (TAB 126) (DHA Evaluation of TriWest's Network).  DHA assessed TriWest's "large network" and concluded it "has merit as evidenced by the commitments from major health plans throughout all 26 states in the TRICARE West Region, an established Veterans Affairs (VA) Patient-Centered Community Care (PC3) network and supported by the large provider volumes."  AR at 13244 (TAB 126) (DHA Evaluation of TriWest's Network).  DHA stated: "The TET found the large network to be advantageous to the Government during contract

performance as evidenced by the current and planned volumes of PCMs and some specialists." *Id.*  In terms of accreditation, DHA notes "The TET determined the Offeror has an adequate plan to maintain accreditation throughout the life of the contract."  AR at 13241 (TAB 126) (DHA Evaluation of TriWest's Network).  The TET only awarded "Strengths" to TriWest for its technical proposal and no "Weaknesses."  *See* AR at 13284–85 (TAB 126) (DHA Evaluation of TriWest's Network).

TriWest did not, as plaintiff argues, "conceal[] the extent to which its purported 'Federal Network' was actually the patchwork of its leased subcontractors' networks."  Pl.'s MJAR at 44.  TriWest explained the nature of its federal network:  "[T]he foundation of our quick start network strategy will be to leverage our existing, accredited TriWest Federal Network used for our VA CCN and PC3 contracts."  AR at 55144 (TAB 383) (TriWest Proposal).  TriWest clarifies this federal network is distinct from its network subcontractors:  "After using our existing Federal Network to identify providers to contract for our T-5 network, we will supplement with additional providers from our network subcontractors."  AR at 55145 (TAB 383) (TriWest Proposal).  The Court disagrees there is "problematic vagueness" in TriWest's technical proposal because TriWest straightforwardly explained the nature of its networks in its proposal.  *See* Tr. at 123:15–17 ("[PLAINIFF]:  . . . [T]he problem again is we're getting into problematic vagueness in the proposal.").  DHA comprehended the intricacies of TriWest's proposal and engaged with the specific operations of TriWest's network in its 50-page evaluation.[16]  *See* AR at 13236–85 (TAB 126) (DHA Evaluation of TriWest's Network).  DHA understood the consistency of TriWest's network and found it to be beneficial, as evidenced by awarding TriWest several strengths.[17]  AR at 13284–85 (TAB 126) (DHA Evaluation of

---

[16] For example, DHA reviewed TriWest's network proposal and summarized TriWest's proposal as having "eight components":

> The TET determined the Offeror's approach to development and maintenance of a network to include the following eight components:  1.  Utilizing its current accredited Federal Network in combination with access to mature, stable networks of providers in all 26 states of the TRICARE West Region via network commitment letters from major health plans; 2. Unilateral contractual arrangements with PCMs throughout its current Federal Network; 3. Network Management Command Center, provider network team and contracting staff targeting current TRICARE contracted providers and new providers; 4. Use of provider databases and large scale analytics to identify additional providers to bring into network; 5. Multi-step model used to size the network within Prime Service Areas (PSAs) and continuous monitoring of utilization to make adjustments to this model; 6. Plan for complementing MTF needs in order to offset gaps in capability within a PSA; 7. Plan for leveraging industry-standard telehealth platforms to meet demands of virtual healthcare as well as expand accessibility in challenged geographic areas; and 8. Ensuring high-quality providers are contracted to meet healthcare needs.

AR at 13242–43 (TAB 126) (DHA Evaluation of TriWest's Network).  DHA then reviewed each of these eight components in-depth and determined how each operated.  *See* AR at 13242–51 (TAB 126) (DHA Evaluation of TriWest's Network).

[17] DHA's thorough consideration of TriWest's technical proposal highlights the following strengths of TriWest's technical approach for "developing and maintaining a provider network," AR at 13236 (TAB 126) (DHA Evaluation of TriWest's Network):

- "The TET finds the use of the ePMO structure to be a **STRENGTH (#1)** of the Offeror's proposal.  The TET determined this strength has significant value because this approach, in combination with the established network, is likely to result in a rapid build in the West Region, which is also likely to exceed

TriWest's Network).  DHA concluded TriWest's "large network . . . has merit as evidenced by the commitments from major health plans throughout all 26 states in the TRICARE West Region, an established Veterans Affairs (VA) Patient-Centered Community Care (PC3) network

the provider load timelines required by the Government.  The advanced provider load timelines are likely to prevent disruption of ATC and likely to prevent gaps in care and contribute to a high level of beneficiary satisfaction and quality healthcare outcomes."  AR at 13243–44 (TAB 126) (DHA Evaluation of TriWest's Network).

- "The first advantage to the Government as a result of the Offeror's initial network build is the likelihood of exceeding access to care standards (time, distance and appointment availability times) . . . .  The second advantage of a large, network build is improved accessibility to providers that meet quality healthcare outcomes in accordance with C.2.1.1. (establish and maintain a provider network that produces high quality clinical outcomes). . . . The TET determined the network development approach to be a **STRENGTH (#2)** . . . .  The TET determined this strength has medium value because most provider types will significantly exceed the DHA provided volumes in the RFP, the majority of beneficiaries in the TRICARE West Region are likely to experience higher quality of care."  AR at 13244–45 (TAB 126) (DHA Evaluation of TriWest's Network).

- "The TET found the network sizing model for individual providers described by the Offeror to be a **STRENGTH (#3).**  The TET determined this to be a strength of medium value to the Government as opposed to minimal value because in the majority of Markets, this is likely to result in very large provider volumes and add flexibility to the network."  AR at 13248 (TAB 126) (DHA Evaluation of TriWest's Network).

- "The TET found that the proposal has merit because it would enable more accurate referral steerage to providers who perform the right kind of highly-specialized care. Gathering and sharing information about subspecialty care is advantageous to the Government during contract performance because steering patients to subspecialists prevents delays in care and more optimal treatment plans resulting in better patient outcomes.  The TET determined that this is a **STRENGTH (#4)** of the Offeror's proposal."  AR at 13249 (TAB 126) (DHA Evaluation of TriWest's Network).

- "The TET finds the Offeror proposes several approaches to develop and maintain a network that meets access to care standards as required by 32 CFR 199.17(p)(5):  A network sizing model taking into account important variables of utilization; use of drive-time mapping software to ensure adequacy within drive-time standards; and, telehealth accessibility to include rural communities.  In addition, the Offeror proposed enhancements that exceed the requirements by guaranteeing a 30-minute drive-time for frequently utilized specialties.  The TET determined this enhancement has merit because it is highly likely to result in improvements in health outcomes due to increased beneficiary compliance with plans of care. Beneficiaries often struggle to make all recurring appointments when the drive-times are burdensome, which can result in less optimal outcomes.  The TET determined this approach is advantageous to the Government during contract performance in specific areas and specialties as it will likely increase compliance with the plan of care as well as increase beneficiary satisfaction, and is a **STRENGTH (#5)** of the Offeror's proposal."  AR at 13255 (TAB 126) (DHA Evaluation of TriWest's Network).

- "The TET determined the use of the TRIAD team has merit because it will likely facilitate a useful collaborative framework with the MTF through weekly outreach with MTF leadership, monthly Market meetings, an annual optimization session, and meetings to identify the timeframes for credentialing and contracting new providers.  This collaborative effort is advantageous to the Government during contract performance because it affords the opportunity to adjust to changing MTFs capability and capacity needs with the contractor's ability to quickly expand the network to supplement all MTFs in the TRICARE West Region as needed.  The TET determined the use of the TRIAD team working with MTF leadership to be a **STRENGTH (#6)** of the proposal for developing and maintaining a provider network that supplements services provided by the MTFs.  The TET determined this strength has significant value to the Government due to the increased collaboration with the MTFs and Markets and the resulting ability to respond to changes in MTF capability and capacity."  AR at 13256 (TAB 126) (DHA Evaluation of TriWest's Network).

DHA concluded that "the Offeror demonstrated an exceptional approach and understanding of the requirement." AR at 13257 (TAB 126) (DHA Evaluation of TriWest's Network).

and supported by the large provider volumes." AR at 13244 (TAB 126) (DHA Evaluation of TriWest's Network).  DHA considered TriWest's plan for maintaining URAC accreditation— "Gold Standard for Health Care Accreditation" that "provid[es] health care organizations with renowned accreditation and certification programs [to] set the highest standards in quality and safety"—and deemed it an "adequate plan."[18]  *Accreditations & Certifications*, URAC (last visited Jan. 31, 2024), https://www.urac.org/accreditations-certifications/programs/; *About URAC*, URAC (last visited Jan. 31, 2024), https://www.urac.org/about/; AR at 13241 (TAB 126) (DHA Evaluation of TriWest's Network).  The TET found the nature of TriWest's technical proposal to be "advantageous" and awarded TriWest strengths for its technical proposal.  AR at 13240–44 (TAB 126) (DHA Evaluation of TriWest's Network); AR at 13284–85 (TAB 126) (DHA Evaluation of TriWest's Network).  DHA thoroughly assessed TriWest's technical proposal and correctly found it to meet the needs of the Solicitation; as such, DHA's review of TriWest's technical proposal was rational.  *Garufi*, 238 F.3d at 1332 ("[T]he procurement official's decision [did not] lack[] a rational basis.").

Plaintiff conceded DHA thoroughly considered TriWest's technical proposal.  Tr. at 124:24–126:9 ("[PLAINTIFF:]  There's evaluation of the network . . . .").  Plaintiff's ultimate argument seems to be "DHA had the opportunity to investigate [TriWest's technical proposal]

---

[18] DHA's robust consideration of TriWest's URAC accreditation approach is as follows:

> The TET determined that the Offeror's plan to use URAC Health Network accreditation meets the requirement (C.2.1.12.1.) for developing and maintaining a provider network that is accredited by a leading health quality measurement organization.  URAC Accreditation is a widely recognized, evidence-based program dedicated to quality improvement and the measurement of performance-based data.  The TET finds that URAC is a leading national healthcare quality measurement program based on the expansive volume of health plans across the nation who have received accreditation.  There are more than 1,000 health plans across all 50 states that are accredited.  URAC Health Network accreditation requires 40 specific core standards are met in the following areas:  organizational structure; policies and procedures; regulatory compliance; delegated functions; marketing and sales; information management; quality management; staffing and oversight; and consumer rights, safety and satisfaction.  The accreditation also includes rigorous requirements for network management, credentialing and re-credentialing.  There are four foundational focus areas that overlay all URAC accreditation programs:  risk management, operations infrastructure, performance monitoring and improvement, and consumer protection and empowerment.  Benefits of URAC accreditation assure patients and purchasers that network providers and facilities meet professional qualifications and have been properly vetted through a rigorous credentialing process.  Furthermore, Health Network Accreditation indicates that provider performance is continuously monitored and evaluated, taking quality of care, program compliance and patient feedback into consideration to determine ongoing network participation.  As required by C.2.1.1.12.1., URAC does consider quality benchmarks for network management, provider credentialing, quality management and improvement, and consumer protection.  The Offeror states on Page II-12 that it will maintain URAC accreditation during the T-5 contract.  Two of the Offeror's core Quality Committees, Policy and Procedure Review Committee and Credentialing Committee, ensure compliance with URAC reaccreditation.

> The TET determined the Offeror has an adequate plan to maintain accreditation throughout the life of the contract.  The TET found that the Offeror's approach to developing and maintaining a network that is accredited by a leading health quality measurement organization in accordance with C.2.1.12.1. is adequate.

AR at 13241 (TAB 126) (DHA Evaluation of TriWest's Network).

further to allow it to conduct an informed evaluation . . . [b]ut, DHA chose not to do so."  Pl.'s MJAR at 46.  The information provided by TriWest related to its technical proposal presented no reasonable indication TriWest "concealed" the true nature of its technical proposal, requiring DHA to "investigate."  *See Garufi*, 238 F.3d at 1333 ("[A] bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" (quoting *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973))); Pl.'s MJAR at 44.  The contracting officer is "generally entitled to rely on a contractor's certifications" and has no obligation to undertake a fishing expedition to find documents disproving TriWest's assertions.  *See Harmonia*, 999 F.3d at 1405.  As such, DHA's award was not arbitrary and capricious because DHA adequately assessed TriWest's technical proposal.  *Garufi*, 238 F.3d at 1332 ("[T]he procurement official's decision [did not] lack[] a rational basis.").

Regarding prejudice, Health Net argues "DHA's errors in its evaluation of TriWest's . . . technical proposal . . . prejudiced HNFS [because] [h]ad DHA evaluated TriWest's proposal in accordance with the Solicitation, procurement law and regulation, DHA would not have found TriWest responsible or awardable."  Pl.'s MJAR at 47.  A bid protest plaintiff must establish alleged "errors in the procurement process significantly prejudiced" plaintiff by showing "there was a 'substantial chance' it would have received the contract award but for the errors." *Bannum*, 404 F.3d at 1353 (quoting *Info. Tech*, 316 F.3d at 1319).  There were no errors in the procurement process related to DHA's evaluation of TriWest's technical proposal; the Court accordingly finds DHA's decision was not arbitrary and capricious.  *Adv. Data Concepts, Inc.*, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors. . . .  [The agency's] evaluations of the offers in the bid were reasonable and complied with the solicitation.").

## X.      Whether DHA's Responsibility Decision Was Arbitrary

Plaintiff argues "DHA's failure to fully investigate any omissions and inconsistencies . . . before award . . . independently renders the award improper because DHA impermissibly conducted its responsibility determination post-award, and reaffirmed award to TriWest despite clear evidence indicating TriWest was not responsible."  Pl.'s MJAR at 41–42.  Plaintiff explains "DHA awarded the contract to TriWest on April 20, 2023 [and] . . . on August 16, 2023, (without terminating the award), DHA 'reopen[ed] the responsibility determination for the awardee.' . . . FAR 9.103(b) expressly states that 'No purchase or award shall be made unless the contracting officer makes an affirmative determination of responsibility.'"  *Id.* at 42 (emphasis omitted) (citation omitted).  Plaintiff reasons "[i]f DHA had concerns regarding TriWest's responsibility . . . DHA was required to terminate the award."  *Id.* at 42.  Plaintiff argues "DHA could not rationally find TriWest responsible" "[b]ased on the overwhelming evidence demonstrating a long-standing pattern of conduct designed to avoid accurate and lawful representation of small business participation and spending."  *Id.* at 42–43.  The government responds:  "[T]he contracting officer found TriWest responsible when DHA initially awarded the contract to TriWest in December 2022 . . . and she again found TriWest responsible when DHA '[r]eaffirm[ed]' the award to TriWest in April 2023."  Gov't's Cross-MJAR at 48 (citations omitted).  The government explains, "Health Net has not identified any statute or regulation requiring an agency to terminate a contract award before re-opening a responsibility

determination." *Id.* at 49.  TriWest responds:  "DHA's contracting officer considered the applicable standards and made appropriate independent judgments regarding TriWest's 'responsibility' as documented in three memoranda that directly address and refute HNFS' allegations . . . ."  TriWest Cross-MJAR at 46.

Plaintiff primarily takes issue with DHA's third and final responsibility determination of TriWest, taking place in August 2023.  Pl.'s MJAR at 42.  On 16 August 2023, DHA re-opened[19] its responsibility determination, as a result of Health Net's second GAO protest to investigate Health Net's allegations "TW improperly excluded its affiliated network subcontractors (owner organizations) from TW's Small Business Subcontracting Plan" and "TW made material misrepresentations regarding its Small Business Subcontracting Plan" "[f]or purposes of responsibility."  AR at 58018 (TAB 423) (25 August 2023 Addendum to TriWest's Responsibility Determination); *see* AR at 60638 (TAB 442) (DHA Letter Reopening Responsibility Determination) ("The purpose of this letter is to reopen the responsibility determination for the awardee and ask TW questions to assist the Government in updating its responsibility determination.").  DHA requested TriWest respond to the following as part of its responsibility determination:

> 1. Please submit a revised list of all first-tier subcontracts with a total contract value of $10 million or more for purposes of the Department of Labor Office of Federal Contract Compliance Programs (OFCCP) pre-award clearance . . . . This list should include affiliated and non-affiliated "Network Subcontractors." . . .
>
> 2. Please explain why TW did not list any Network Subcontractors in response to the Government's request in previous communications concerning the Government's responsibility determination, and, to the extent TW is adding any other subcontractors to its list, please explain why they were not included in the previous list.

AR at 60638 (TAB 442) (DHA Letter Reopening Responsibility Determination).  Regarding OFCCP compliance, on 18 August 2023, TriWest "submitted its response, including an updated list of first-tier subcontractors . . . [and] [t]he list did not include any new subcontractors other than network affiliated subcontractors."  AR at 58020 (TAB 423) (25 August 2023 Addendum to TriWest's Responsibility Determination).   Further on 25 August 2023, TriWest

---

[19] The Court recounts the procedural history leading to DHA re-opening its responsibility determination of TriWest, *see supra* Section I.  On 22 December 2022, DHA awarded TriWest the contract.  AR at 14052 (TAB 166) (20 April 2023 Addendum to TriWest's Responsibility Determination).  On 17 January 2023, Health Net challenged the award to TriWest by GAO protest and, later, the government engaged in corrective action as a result of the protest.  *Id.*  On 20 April 2023, after conducting a new responsibility determination considering TriWest's revised proposal, DHA re-awarded the contract to TriWest, finding TriWest to be responsible.  AR at 14145 (TAB 167) (DHA Award Letter to TriWest); AR 14052–59 (TAB 166) (20 April 2023 Addendum to TriWest's Responsibility Determination) ("Pursuant to FAR 9.105-2, I hereby find that TW has the capabilities required to adequately perform the proposed contract and is considered responsible within the meaning of FAR Subpart 9.104, and is therefore, eligible for this award.").  On 1 May 2023, Health Net filed its second GAO protest, alleging, among other things "TW improperly excluded its affiliated network subcontractors (owner organizations) from TW's Small Business Subcontracting Plan" and "TW made material misrepresentations regarding its Small Business Subcontracting Plan."  AR at 58018 (TAB 423) (25 August 2023 Addendum to TriWest's Responsibility Determination).

confirmed that despite previous correspondence attributing $[XXXXX]M to non-affiliated network subcontractors (as part of the Corrective Action ENO 1 response), none of the non-affiliated network subcontracts are equal to or greater than $10M.  TW clarified that the $[XXXXX]M attributed to Non-Affiliated Network Subcontractors in its ENO 1 response during Corrective Action included the estimated contract values of certain proposed network support services (most significantly, Availity, LLC) as Network arrangements that were bundled in its accounting cost build-up along with costs for the group that it specifically identified as Non-Affiliated Network Subcontractors.  Therefore, these were properly excluded from the list of first-tier subcontractors requiring OFCCP clearance.

*Id.*  The contracting officer stated:  "I reopened the responsibility determination of TW to ensure DHA's full compliance with OFCCP clearance requirements and to confirm TW's satisfactory record of integrity and business ethics. . . .  I have not received any additional information impacting my previous responsibility determination."  *Id.*

In response to DHA's question "why TW did not include its network affiliated subcontractors in the list submitted in response to the Government's previous communications," TriWest stated:

TriWest's response to prior communications regarding the Government's responsibility determination were presented closely following discussions regarding TriWest's Small Business Subcontracting Plan.  During those discussions, TriWest had noted that its shareholders acting as Network Subcontractors were "affiliates" under FAR 2.101 and therefore not included as subcontracting opportunities under the Small Business Subcontracting Plan.  It was not clear to TriWest at that time that affiliates were required to be included in the listing that was previously provided in the Government's prior responsibility determination, as it was expected that such affiliates would also be treated differently for this purpose.

AR at 58023 (TAB 423) (25 August 2023 Addendum to TriWest's Responsibility Determination).  DHA stated:

TW excluded the network affiliated subcontractors based on the guidance the Government provided during discussions. At that time, the Government believed that TW properly excluded its network affiliated subcontractors since these subcontractors meet the definition of "affiliate" found at FAR 2.101.  Therefore, it was understandable for TW to exclude its network subcontractors from the list of subcontractors provided for purposes of OFCCP clearance.

*Id.*  On 25 August 2023, DHA found TriWest to be responsible.  AR at 58024 (TAB 423) (25 August 2023 Addendum to TriWest's Responsibility Determination).

The Federal Circuit has stated "[c]ontracting officers are 'generally given wide discretion' in making responsibility determinations and in determining the amount of information that is required to make a responsibility determination." *Impresa Construzioni Geom. Domenico Garufi*, 238 F.3d 1324, 1334–35 (Fed. Cir. 2001) (quoting *John C. Grimberg Co. v. United States*, 185 F.3d 1297, 1303 (Fed. Cir. 1999)).  FAR 9.103(b) states "No purchase or award shall be made unless the contracting officer makes an affirmative determination of responsibility."  FAR 9.103(b) (2023).  When DHA awarded the contract to TriWest, DHA made a responsibility determination for TriWest in December 2022.  AR at 57771 (TAB 420) (DHA Determination of TriWest Responsibility); *see also* AR at 14145 (TAB 167) (DHA Award Letter to TriWest).  DHA then re-opened its responsibility of TriWest in April 2023 and August 2023 and found TriWest to be responsible in both instances.  AR at 14052–59 (TAB 166) (20 April 2023 Addendum to TriWest's Responsibility Determination); AR at 14145 (TAB 167) (DHA Award Letter to TriWest); AR at 58018–24 (TAB 423) (25 August 2023 Addendum to TriWest's Responsibility Determination); *see* AR at 60638 (TAB 442) (DHA Letter Reopening Responsibility Determination).  Under FAR 9.103(b), DHA was required to "make[] an affirmative determination of responsibility" before "award."  FAR 9.103(b) (2023).  DHA made a responsibility determination before award in 2022, then again in April 2023 as a result of corrective action, and a third and final time in August 2023 as a result of Health Net's GAO protest.  *Id.*; AR at 14052–59 (TAB 166) (20 April 2023 Addendum to TriWest's Responsibility Determination); AR at 14145 (TAB 167) (DHA Award Letter to TriWest); AR at 58018–24 (TAB 423) (25 August 2023 Addendum to TriWest's Responsibility Determination); *see* AR at 60638 (TAB 442) (DHA Letter Reopening Responsibility Determination).  Plaintiff's argument related to the timing of DHA's responsibility determinations is meritless because DHA made determination before award, was permitted to engage in corrective action, and able to make responsibility determinations without "terminat[ing] the award."  FAR 9.103(b) (2023); Pl.'s MJAR at 42.  The parties have not identified any caselaw or provision of the FAR requiring an agency to terminate a contract award before re-opening a responsibility determination.  *See* Pl.'s MJAR; Gov't's Cross-MJAR; Tri-West's Cross-MJAR.  As such, DHA did not irrationally re-open the responsibility determination of TriWest here and DHA's award was not arbitrary and capricious on these grounds as a result.  *Garufi*, 238 F.3d at 1332 ("[T]he procurement official's decision [did not] lack[] a rational basis.").

At oral argument, plaintiff clarified its argument ultimately is the same as its argument related to TriWest's exclusions in its initial and revised proposals.  Tr. at 120:4–121:2 ("THE COURT: . . . [W]hat specifically did DHA violate in its responsibility determination? . . .  [T]his is all based off of the [alleged] improper exclusions?  [PLAINTIFF]:  Yes, Your Honor. . . . [T]his is an issue of particular importance in the context of a responsibility determination because of the information that was before the agency with regard to knowing reliance on what it had been previously told were impermissible exclusions.").  The Court has already determined TriWest's exclusion of certain subcontractors was permissible.  *See supra* Sections V–VI.  Plaintiff's argument about DHA's responsibility decision is essentially the same as its argument about TriWest's exclusions, and its argument here fails for the same reasons.  *Id.*  Plaintiff's argument rests on the idea TriWest has engaged in "a long-standing pattern of . . . avoid[ing] accurate and lawful representation of small business participation and spending."  Pl.'s MJAR at 43.  Specifically, Health Net takes issue with TriWest's "reli[ance] on billon-dollar subcontracting exclusions that it knew were plainly impermissible, continually shielded its

unlawful exclusions from DHA, and misrepresented its purported 'good faith reliance' on prior communications regarding its subcontracting approach." *Id.* Here, DHA has thoroughly assessed TriWest's exclusions and concluded they were permissible; the Court agrees these exclusions are permissible for the reasons discussed *supra*. *See supra* Sections V–VI. Further, "[c]ontracting officers are 'generally given wide discretion' in making responsibility determinations." *Garufi*, 238 F.3d at 1334–35 (Fed. Cir. 2001) (quoting *John C. Grimberg Co.*, 185 F.3d at 1303). Particularly under this deferential standard from the Federal Circuit, DHA has not made an irrational responsibility determination given its thorough consideration of TriWest's exclusions, and thus DHA's award was not arbitrary and capricious. *Id.* at 1332 ("[T]he procurement official's decision [did not] lack[] a rational basis.").

Regarding prejudice, Health Net argues "DHA's errors in its evaluation of TriWest's . . . responsibility determination . . . prejudiced HNFS [because] [h]ad DHA evaluated TriWest's proposal in accordance with the Solicitation, procurement law and regulation, DHA would not have found TriWest responsible or awardable." Pl.'s MJAR at 47. A bid protest plaintiff must establish alleged "errors in the procurement process significantly prejudiced" plaintiff by showing "there was a 'substantial chance' it would have received the contract award but for the errors." *Bannum*, 404 F.3d at 1353 (quoting *Info. Tech.*, 316 F.3d at 1319). There were no errors in the procurement process related to DHA's responsibility determination of TriWest; the Court accordingly finds DHA's decision was not arbitrary and capricious. *Adv. Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000) ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors. . . . [The agency's] evaluations of the offers in the bid were reasonable and complied with the solicitation.").

## XI.     Whether Injunctive Relief Is Appropriate[20]

Plaintiff argues it "is entitled to injunctive relief setting aside the award to TriWest and (1) requiring DHA to reopen its evaluation and award decision in accordance with law, regulation, and the Solicitation and (2) enjoin TriWest's further participation in this procurement." Pl.'s MJAR at 48. Plaintiff reasons "HNFS clearly faces irreparable harm absent a permanent injunction, because a permanent injunction is the only remedy for DHA depriving HNFS of a fair opportunity to compete under the Solicitation." *Id.* at 49. "Absent injunctive relief," plaintiff argues, "[Health Net] will lose a significant opportunity to compete for the chance to continue serving TRICARE beneficiaries." *Id.* The government responds: "[T]he Court could remand to DHA with instructions to re-evaluate TriWest's proposal in accordance with the Court's opinion. . . . [I]f the Court were to determine that DHA committed a prejudicial error by failing to reasonably evaluate TriWest's small business subcontracting plan." Gov't's Cross-MJAR at 57.

---

[20] Both parties agreed at oral the Court can consider the filed declarations—the Declaration of Kenneth P. Yale and the Declaration from Dr. Joyce Grissom—for injunction. Tr. at 137:23–138:22 ("[THE COURT:] Can the Court consider [plaintiff's] declaration? [PLAINTIFF]: Yes, Your Honor . . . . THE COURT: [Can] the Court . . . consider the [g]overnment's declaration? [PLAINTIFF]: For the same reasons, Your Honor. THE COURT: [Government]? [GOVERNMENT]: For purposes of the injunctive relief factors, if the Court gets that far, yes, the Court can consider both declarations for that purpose. *Axiom* doesn't apply to injunctive relief factors . . . .").

The Court considers the following factors when determining whether to issue a permanent injunction: "(1) whether . . . the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief." *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004). According to the first factor, plaintiff is not entitled to injunctive relief because plaintiff does not prevail on the merits. *See supra* Sections V–X. The Court therefore need not consider the remaining factors of the test for a permanent injunction. *Info. Tech. & Applications Corp. v. United States*, 51 Fed. Cl. 340, 357 n.32 (2001) ("Absent success on the merits, the other factors are irrelevant."), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003).

## XII.   Conclusion

For the foregoing reasons, the Court (1) **DENIES** plaintiff Health Net's Motion for Judgment on the Administrative Record, ECF No. 58; (2) **GRANTS** the government's Cross-Motion for Judgment on the Administrative Record, ECF No. 61; and (3) **GRANTS** TriWest's Cross-Motion for Judgment on the Administrative Record, ECF No. 62. The Clerk is directed to enter judgment accordingly.